**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BRANDON HAMMAN, *Plaintiff,* v. The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LEONARD JAMIE SNYDER, in his individual and official capacities, *Defendants.* | Case No. 3:25-cv-00736-NJR **Chief Judge Nancy J. Rosenstengel** |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Pursuant to Rule 65, Fed. R. Civ. P., Plaintiff Brandon Hamman hereby moves for a preliminary injunction against Defendants. The City of Carbondale ("City") has adopted a vague ordinance that fails to specify what manner of speech is permitted when people place temporary signs in the ground, an ordinance that cannot satisfy constitutional scrutiny. It has then adopted an unwritten policy that enforces that ordinance in a viewpoint-discriminatory manner. Hamman has suffered and is suffering irreparable injury from the infringement of his cherished constitutional rights. The harm to Hamman far outweighs any plausible harm to Defendants, and issuing an injunction to prevent further irreparable injury is in the public interest. Hamman seeks a preliminary injunction that would constrain the enforcement of Carbondale Ordinance § 15.4.10.8 due to its constitutional infirmities and curtail Defendants' policy of unequal enforcement.

**STATEMENT OF FACTS**

Plaintiff Brandon Hamman is a pro-life advocate who serves as a missionary and sidewalk counselor through Gospel for Life, a non-profit organization operating under the authority of Christ

Church Carbondale, a 501(c)(3) organization. Hamman Decl. ¶ 3. On April 16, 2025, Hamman was peacefully demonstrating near the CHOICES Center for Reproductive Health located at 600 N Giant City Road in Carbondale, Illinois, when he became entangled in a bewildering enforcement action regarding the City's temporary sign ordinance, Carbondale Ordinance § 15.4.10.8. *Id.* ¶ 4.

At approximately 11:00 a.m.,[1] Defendant John Lenzini, the Community Development Manager for the City of Carbondale, approached Hamman while he was exercising his constitutional rights in a grassy area of land owned by the City of Carbondale, open to the public. Hamman Decl. ¶¶ 5, 8 Lenzini informed Hamman that, while this was an area where Hamman could engage in speech, the signs he and other demonstrators were using were "in violation" according to the City Attorney, Defendant Jamie Snyder. *Id.* ¶ 9. When Hamman attempted to understand what specific violation had occurred, Lenzini remained intractable, particularly declaring that signs offering "free baby supplies" were not part of a constitutionally protected demonstration. *Id.* ¶¶ 10–11. Lenzini repeatedly emphasized that he had consulted with Defendant Snyder and that his enforcement actions originated from Snyder, who had "assured me they can't be there." *Id.* ¶ 12. The specific basis for this determination was never clearly articulated.

Attempting to comply with what he perceived might be the issue, Hamman retrieved additional signs from his vehicle with different wording that specifically could not be construed to offer goods or services but were purely demonstrative in nature. Hamman Decl. ¶ 13. These signs contained messages such as "we will adopt your baby," "love your preborn neighbor as yourself,"

---

[1] The timestamped video reflects an hour earlier than the actual timing of the events. We use the actual time of events in discussing them. Please note the timestamp on Exhibits 1 and 6 reflects this time difference, showing a time an hour earlier than the actual events.

and "there may be time to save your baby, abortionpillreversal.com." *Id.* ¶ 14. Despite this change, Lenzini maintained that the signs remained in violation. *Id.* ¶ 15.

The scenario grew more confusing when Hamman presented Lenzini with a digital written copy of Carbondale Ordinance § 15.4.10.8, pointing specifically to the exception for First Amendment activity, such as demonstrations, contained in § 15.4.10.8(A)(5)(a)(4). *Id.* ¶ 16. This provision expressly states that it "is not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." When Hamman asserted his First Amendment right to public demonstrations by stating, "I am demonstrating against abortion, I have a right to do that," Lenzini denied his constitutional rights, responding with a conclusory "No, you don't." *Id.* ¶ 18.

The uncertainty about the ordinance's requirements escalated when Lenzini displayed a text message from Defendant Snyder instructing him to pull up the signs, but without any citation to specific provisions of the ordinance that would justify such action. *Id.* ¶ 19. By approximately 11:25 a.m., Lenzini began writing a citation for Hamman, who had refused to remove his signs based on his understanding of his First Amendment rights and the ordinance exceptions. *Id.* ¶ 20.

The confusion deepened when City of Carbondale police officers arrived at approximately 11:34 a.m. and provided yet another interpretation of the ordinance, telling Hamman that the signs "can't be in the ground" but that he could "hold them and walk around." *Id.* ¶ 21. The officers ambiguously added, "but I guess they can't be on the easement" – a term not defined or referenced at all in the relevant ordinance provisions. *Id.* ¶ 22.

Hamman explained to the officers that holding signs while approaching vehicles to speak with or pray for individuals created a safety risk in windy conditions, as signs could potentially be blown into the street. *Id.* ¶ 23. Seeking clarification, Hamman asked the officers whether there

would be any violation if he moved the signs twenty feet from the curb, as seemingly permitted by § 15.4.10.8(A)(3) of the ordinance. *Id.* ¶ 24. The officers responded that there would be no violation, introducing yet another interpretation of the ordinance's requirements. *Id.* ¶ 25.

Immediately contradicting the officers' understanding, Lenzini asserted that Defendant Snyder had instructed him that no signs whatsoever were allowed on public property, even when placed twenty feet from any street or right of way – an interpretation that finds no explicit support in the text of the ordinance. *Id.* ¶ 26. Lenzini indicated that if the signs were removed, no citation would be issued. *Id.* ¶ 27. After consulting with his attorneys, Hamman reluctantly complied by removing his signs, and no citation was ultimately issued. *Id.* ¶ 28.

The following day, April 17, 2025, Hamman attempted to navigate the ordinance's ambiguities by pursuing what appeared to be an available avenue for legal compliance. *Id.* ¶ 29. Having read § 15.4.10.8(A)(5)(b)(2), which provides that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days" and that "[a] new permit shall be issued each time the temporary sign is to be displayed," Hamman went to Carbondale City Hall to obtain such a permit. *Id.* ¶ 30.

Upon arrival, Hamman again encountered Defendant Lenzini, who issued a categorical denial that such a permit existed or could even be issued, despite the explicit language in the ordinance. *Id.* ¶ 33. Lenzini flatly refused to issue a permit to Hamman, stating "you can only get a sign permit if you own the property" and "you can carry [the signs] like we told you yesterday." *Id.* ¶ 34. This interpretation directly contradicts § 15.4.10.8(A)(5)(b)(3), which expressly states that "[t]emporary signs need not be located on the site for which the event is to take place." Hamman left City Hall without a permit or any clear direction on how to obtain one as seemingly provided for in the ordinance. *Id.* ¶ 35.

Through counsel, Hamman sent a demand letter on April 22, 2025, requesting written assurances by April 29, 2025, that he could demonstrate with temporary signs in compliance with the requirements set out in the ordinance. *Id.* ¶ 37. The City responded to this letter with a cursory response that did not substantively address any of the concerns in Hamman's letter, effectively adopting an unwritten policy that bans demonstrators like Hamman from using temporary signs, despite language in the ordinance that would arguably permit such activity. *Id.* ¶ 38.

The City's ordinance contains numerous ambiguities that have led to confusion and inconsistent enforcement. For instance, § 15.4.10.8(A)(1) contains no definition of "public right of way" and fails to specify what it means for a sign to be "erected on" the public right of way. Section 15.4.10.8(A)(3) prohibits temporary signs within twenty feet of the curb line of an adjoining street, reasonably suggesting that signs placed more than twenty feet from the curb are permissible. The ordinance also provides that temporary signs are prohibited "except as allowed by section 15.4.10.8," which contains exceptions for First Amendment activities and 501(c) organizations. Yet, despite these written provisions, city officials have interpreted and enforced the ordinance in a manner that effectively prohibits all temporary signs on public property, regardless of their distance from rights-of-way or the nature of the speech involved.

This inconsistent and confusing enforcement of the ordinance has left Hamman unable to determine how to lawfully exercise his First Amendment rights, creating a chilling effect on his protected speech and religious expression. *Id.* ¶ 42. Despite multiple attempts to comply with or understand the ordinance's requirements, Hamman has been unable to obtain clear guidance from city officials on how he might legally conduct his demonstrations with temporary signs.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *see Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 446 (7th Cir. 2022); *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016).

But when it comes to the First Amendment, the overall burden remains on the Government to justify its infringement of constitutional rights. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citations omitted). Defendants here bear the burden of demonstrating that their restriction on speech is constitutional and bear that burden at this preliminary stage. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665–66 (2004) (holding government bears burden of proof at trial on ultimate question of constitutionality of challenged speech restriction, and that plaintiff must be deemed likely to prevail at preliminary injunction stage unless government meets its burden of showing that restriction satisfies strict scrutiny); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (affirming, "[t]he burdens at the preliminary injunction stage track the burdens at trial."); *see Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). Defendants cannot satisfy the heavy burden they face to justify their conduct.

**I. Hamman Is Likely to Succeed on the Merits.**

Likelihood of success on the merits has long been recognized as the most important factor, especially when a plaintiff alleges an injury to their First Amendment rights. Where a state action results in loss of First Amendment freedoms, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining

the enforcement of a statute that is probably unconstitutional." *ACLU v. Alvarez*, 679 F.3d 583, 586 (7th Cir. 2012); *see also Baird v. Bonta*, 85 F.4th 1036, 1041 (9th Cir. 2023) ("The first factor—likelihood of success on the merits—is the most important (and usually decisive) one in cases where a plaintiff brings a constitutional claim.").

Hamman is likely to succeed on the merits of his claims under the First Amendment for three distinct reasons: (1) the City's ordinance is unconstitutionally overbroad, (2) it is an unjustified restriction on speech in a public forum, and (3) it is enforced in a viewpoint-discriminatory manner. To be clear, these are three alternative grounds Hamman presents, and any one of them is alone sufficient to determine that he is likely to succeed on the merits.

### A. The Ordinance is Unconstitutionally Broad.

"Vague rules are overbroad because their scope is uncertain and . . . they tend to produce large chilling effects." *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023); *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997). The mechanisms by which vague rules cause chilling effects are two-fold. A statute can be impermissibly vague where it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

A vague regulation of expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno*, 521 U.S. at 871–72. In fact, the Supreme Court has regularly warned against vagueness as a particular danger to First Amendment rights. *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); *Hoffman*

Page 7 of 19

*Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (If "the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

### 1. The Ordinance is Facially Overbroad.

The First Amendment prohibits laws that vaguely infringe on the rights to speak. *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (The void-for-vagueness doctrine forbids the enforcement of a law that contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984)); *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). As the Supreme Court has reasoned:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971), and *Reno*, 521 U.S. at 870–71 & n.35)). The law "must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown*, 86 F.4th at 772. "[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

One crucial way in which vagueness is demonstrated is that "the indeterminacy of what conduct constitutes a violation makes a statute vague." *Brown*, 86 F.4th at 772; *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved;

but rather the indeterminacy of precisely what that fact is."). That is precisely the problem here.

The vagueness of the ordinance was manifested here by the conduct of Defendants themselves; their reasoning constantly shifted without clarity about what conduct was permitted and what was not. Officials provided shifting explanations for why Hamman's conduct violated the ordinance, first claiming signs offering "free baby supplies" weren't part of a protected demonstration, then asserting no signs could be placed on public property regardless of distance from the curb, and finally stating no permits were available despite language in the ordinance providing for them.

But this vagueness is inherent in the ordinance itself. At its core, the ordinance lacks clear definitions for key terms, most notably failing to define "public right of way" in its prohibition against signs "erected on, suspended over, or encroach[ing] upon the public right of way." § 15.4.10.8(A)(1). While another section of Carbondale's code, § 17-12-2, does define this term, the ordinance doesn't specify whether this definition applies, creating fundamental confusion about where signs are permitted and what are not. Section 15.4.10.8(A)(1) also fails to specify what it means for a sign to be "erected on" the public right of way. The problem here, accordingly, is a problem evidenced in other vagueness cases; members of the public lack any way to know the ordinary meaning of the ordinance or to know what conduct may be prohibited. *See generally Brown*, 86 F.4th at 772.

The placement restrictions are similarly ambiguous. While one section of the ordinance prohibits temporary signs within twenty feet of the curb line (suggesting signs beyond this distance would be permitted), city officials enforced the ordinance as a complete ban on any signs placed on public property.

The ordinance also contains language appearing to exempt demonstrations from certain

restrictions. The ordinance states it is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations," § 15.4.10.8(5)(a)(4), but fails to articulate the scope of this exemption. Further confusion stems from provisions regarding a permitting process for 501(c) organizations that on their face apparently allow for exceptions for such organizations, without specifying the nature or scope of those exceptions.

The ordinance is silent on methods of placement, yet officials interpreted it to prohibit any signs staked in the ground. All these factors combine to leave ordinary citizens unable to understand the scope of the ordinance. No citizen, reading the ordinance, can know what conduct is and is not prohibited.

### 2. The Ordinance's Vagueness Authorizes Arbitrary and Discriminatory Enforcement.

Moreover, a law must not also "vest[] unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). The Constitution does not tolerate a law "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "The vague statutory language also leaves too much room for arbitrary and discriminatory enforcement, chilling plaintiffs who are reasonably concerned about over-enforcement." *Brown*, 86 F.4th at 774; *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."). Generally, a "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969).

In *Niemotko v. Maryland*, 340 U.S. 268, 269 (1951), the Supreme Court unanimously

reversed the disorderly conduct conviction of persons who held religious meetings in a public park without permits. The Supreme Court emphasized its condemnation of "statutes and ordinances which required that permits be obtained from local officials as a prerequisite to the use of public places, on the grounds that a license requirement constituted a prior restraint on freedom of speech, press and religion, and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid." *Id.* at 271. In *Niemotko,* there was no official ordinance or statute; "[n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; [and] no substantial interest of the community to be served." *Id.* at 272. As a necessary result, "the park was denied because of the City Council's dislike for or disagreement with the Witnesses or their views." *Id.*

The same "standard" exists here. Although the ordinance states that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign" through a permitting process, § 15.4.10.8(A)(5)(b)(2), it critically fails to articulate any standards, criteria, or guidelines by which officials must evaluate these permit applications. This absence of objective standards creates a system where approval depends entirely on the subjective judgment of city officials, allowing for arbitrary decisions based on personal preference or, worse, the content or viewpoint of the proposed speech. The complaint illustrates this unbridled discretion in practice: when Hamman attempted to obtain the permit explicitly mentioned in the ordinance, Defendant Lenzini simply declared that "there was no such permit" and flatly refused to issue one, despite the clear language in § 15.4.10.8(A)(5)(b)(2) providing for such permits.

Requiring a permit before political and religious speech without providing an articulable standard for that speech is unconstitutional; the government lacks authority to determine who may speak with arbitrary standards. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750,

755 (1988) (highlighting the constitutional problem "[w]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity").

### B. The Ordinance is an Unconstitutional Restriction of Speech in a Public Forum.

The location where Hamman exercised his constitutional rights to engage in pro-life speech, a grassy area owned by the public on which the public had a right of way, was a public forum. A traditional public forum is a place "which by long tradition or by government fiat has been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). In fact, "streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. In these quintessential public forums, the government may not prohibit all communicative activity." *Id.* at 38; *Tucker v. City of Fairfield*, 398 F.3d 457, 460 (6th Cir. 2005) (holding that public right-of-way was traditional public forum and affirming injunction against ban on temporary signs in that forum); *Rappa v. New Castle County*, 18 F.3d 1043, 1070–71 (3d Cir. 1994) (holding that public rights-of-way are properly considered traditional public fora). It was open to the public generally for use, and none of the Defendants or their employees ever suggested that it was not generally available as a forum for political activity.

In a traditional public forum such as this one, the government may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45. In this context, "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," and does not "burden substantially more speech than is

necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (quotation marks and citations omitted).

The ordinance at issue here is not narrowly tailored. In *Tucker*, the Sixth Circuit explained the importance of a narrowly tailored ordinance at length:

> the asserted government interests of keeping the public right-of-way clear and preserving the aesthetics of the community, while generally considered substantial, are simply not achieved any less effectively absent the application of the ordinance in this case. There is no objective evidence in the record before us suggesting that the temporary placement of the balloon in the public right-of-way has any adverse effects, such as obstruction of pedestrian or automobile traffic. By applying the ordinance to prohibit the temporary use of the balloon in this case, it therefore appears that the City has applied its ordinance in a manner that is "substantially broader than necessary" to achieve its interests.

*Tucker*, 398 F.3d at 464. The exact same principle applies here. Hamman has provided in his affidavit images that serve as examples of the temporary signs he uses. Those signs are only used very briefly while he engages in his constitutionally protected activity. No traffic is obstructed; no vision is impaired—and even less so when Hamman's small signs are displayed a significant distance from the road. Accordingly, the application of the ordinance to speech like that of Hamman burdens far more speech than is necessary.

### C. Defendants' Actions Unconstitutionally Discriminate Based on Viewpoint.

"In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). A finding of viewpoint discrimination is dispositive in showing that government action is unlawful. *See Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106 (2001). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829; *see Lamb's Chapel v. Ctr. Moriches Union Free Sch.*

*Dist.*, 508 U.S. 384, 394 (1993) ("'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'") (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)); *see also Widmar v. Vincent*, 454 U.S. 263, 270 (1981).

The Supreme Court has repeatedly struck down as unconstitutional policies that exclude religious viewpoints from public fora. For example, in *Good News Club*, where the government created a limited public forum for individuals and community organizations to use for free speech events, the Court held that speakers and displays could not be excluded based on their religious viewpoint. 533 U.S. at 106–7. A school district excluded the Child Evangelism Fellowship ("CEF") from its after-school activities forum based on CEF's religious viewpoint. *Id.* at 107. As in this case, a Christian group was excluded from the use of a public forum. The district permitted community organizations that taught morals and character development, such as the Boy Scouts, but excluded CEF because it taught morals and character development from a "quintessentially religious" viewpoint. *Id.* In striking down the policy, the Supreme Court said, "[w]hat matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." *Id.* at 111. Indeed, "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the grounds that the subject is discussed from a religious perspective." *Id.* at 112 (emphasis added). Accordingly, "[w]hen Milford denied the Good News Club access to the school's limited public forum on the ground that the Club was religious in nature, it discriminated against the Club because of its religious viewpoint." *Id.* at 120.

Defendants have adopted a policy that implements their ordinance in a manner that discriminates based on religious viewpoint. As highlighted above, the ordinance is facially vague and ambiguous in its scope. In practice, Defendants implement the ordinance in a way targeted towards religious pro-life speakers. Hamman does not just allege this. Hamman's affidavit includes several pictures he has taken of small temporary signs on public property all over the City of Carbondale. For a variety of other forms of speech, Defendants do not enforce the ordinance at all but have a policy of inaction. But in the case of Hamman's, pro-life religious speech, they have engaged in a targeted campaign of enforcement. Such a campaign of viewpoint discrimination is anathema to the First Amendment.

**II.     Hamman Will Suffer Irreparable Harm Absent Relief.**

The Seventh Circuit has regularly emphasized that "even short deprivations of First Amendment rights constitute irreparable harm," *Higher Soc'y of Indiana v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017). Hamman will suffer immediate and irreparable harm if the Court does not prohibit Defendants from enforcing their unconstitutional policy. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)). This is especially true when First Amendment rights are at issue.

A citizen who exercises the right to free speech exercises a right that "lies at the foundation of free government." *Schneider v. State*, 308 U.S. 147, 165 (1939). The deprivation of such protected rights constitutes, a priori, irreparable harm. When plaintiffs seek to enjoin restraints on

their free speech, their likelihood of success on the merits is generally dispositive of their entitlement to an injunction. And this is as it should be; once First Amendment rights have been violated, their ongoing violation is an affront to the Constitution. The ongoing loss of First Amendment freedoms has a chilling effect on Hamman and other religious members of the public who are being discriminated against and cannot be compensated by money damages.

### III. The Balance of the Equities Favors Preliminary Injunctive Relief.

The balancing of the equities favors Hamman. Granting preliminary injunctive relief would ensure that Hamman does not suffer ongoing retaliation against his First Amendment rights during the pendency of this lawsuit. By contrast, Defendants will suffer no harm whatsoever by any order prohibiting the implementation of the unconstitutional ordinance. Defendants cannot claim an interest in continued enforcement of an unconstitutional practice against First Amendment rights. See *Elrod*, 427 U.S. at 373.

The balance of the equities favors a plaintiff whose First Amendment rights are being chilled since "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 588–90 (citation omitted). Where, as here, a plaintiff credibly alleges that its First Amendment rights have been violated, "[t]he fact that [the plaintiff] has raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [the plaintiff's] favor." *Am Bev. Ass'n v. City and Cnty. of San Franciso*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Cmty House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)).

### IV. The Injunction Is in the Public Interest.

Finally, the public interest also supports granting preliminary injunctive relief. Courts

considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles and that "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *see Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) (listing cases). "Surely, upholding constitutional rights serves the public interest." *Newsom Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980). The protection of constitutional rights from infringement clearly outweighs any purported concerns of Defendants. The public interest is necessarily served by an injunction that preserves the constitutional rights of Hamman while this lawsuit is ongoing. *See Grossbaum v. Indianapolis-Mario Cnty. Bldg. Auth.*, 63 F.3d 581, 585 (7th Cir. 1995) (stating that deciding whether a restriction was viewpoint discrimination was "surely in the public interest").

## CONCLUSION

For these reasons, Hamman respectfully requests that the Court issue a preliminary injunction prohibiting Defendants from enforcing their unconstitutionally vague ordinance against Hamman's protected speech activities in a public forum.

Respectfully submitted,

By: /s/ Kelsey E. McGee*
Kelsey E. McGee
Stuart J. Roth**
Nathan J. Moelker*
Liam R. Harrell**
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE

        Washington, D.C. 20002
        Tel: (202) 641-9160
        Fax: (202) 546-9309
        Email: kmcgee@aclj.org;
        sroth@aclj.org;
        nmoelker@aclj.org;
        lharrell@aclj.org

        *Counsel for Plaintiff*

*Admitted to this Court's General Bar
** Pro Hac Vice Applications Forthcoming

## **CERTIFICATE OF SERVICE**

   I hereby certify that on the 8th day of May, 2025, a true and correct copy of the above and foregoing document was served by express mail on the following:

Leonard Jamie Snyder
200 S. Illinois Avenue
Carbondale, IL 62901
Ph 618-457-3215

City of Carbondale, Illinois
200 S. Illinois Avenue
Carbondale, IL 62901
Ph 618-457-5302

John Lenzini
200 S. Illinois Avenue
Carbondale, IL 62901
Ph 618-457-3251

                */s/ Kelsey E. McGee*
                Kelsey E. McGee
                *Counsel for Petitioners*