IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRANDON HAMMAN,<br>*Plaintiff,*<br>v.<br>The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LEONARD JAMIE SNYDER, in his individual and official capacities,<br>*Defendants.* | Case No. 3:25-cv-00736-NJR<br><br>**Chief Judge Nancy J. Rosenstengel** |

## DECLARATION OF PLAINTIFF BRANDON HAMMAN

Pursuant to 28 U.S.C. § 1746, I state the following:

1. I am a citizen of the United States and a resident of the State of Illinois. I am over the age of eighteen years.

2. I am the Plaintiff in the above-captioned case. I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently to them.

3. I am a pro-life advocate who serves as a missionary and sidewalk counselor through Gospel for Life, a non-profit organization operating under the authority of Christ Church Carbondale, a 501(c)(3) organization.

4. On April 16, 2025, I was peacefully demonstrating near the CHOICES Center for Reproductive Health located at 600 N Giant City Road in Carbondale, Illinois.

5. I was wearing a bodycam that day. The full video I took, with certain portions omitted where I was engaged in privileged communications with my attorneys, is attached as Exhibit One to this Declaration.

6. I was exercising my constitutional rights to protest abortion in a grassy area of land owned by the City of Carbondale that is open to the public.

7. I had with me some small temporary signs that I would at times carry and at other times affix to the ground. I have attached pictures of examples of those signs as exhibits, Exhibits Two through Five to this Declaration.

8. The signs are small and unobtrusive; as is clear from the pictures thereof, they do not block anyone's field of vision or in any other way interfere with others.

9. At approximately 11:00 a.m.,[1] John Lenzini, the Community Development Manager for the City of Carbondale, approached me while I was demonstrating.

10. Mr. Lenzini informed me that the signs I and other demonstrators were using were "in violation" according to the City Attorney, Jamie Snyder.

11. When I asked Mr. Lenzini what specific violation had occurred, he was unable to clearly articulate the exact nature of the violation.

12. Mr. Lenzini specifically stated that signs offering "free baby supplies" were not part of a constitutionally-protected demonstration.

13. Mr. Lenzini repeatedly emphasized that he had consulted with Mr. Snyder and that his enforcement actions originated from Mr. Snyder, who had "assured me they can't be there."

14. In an attempt to comply with what I perceived might be the issue, I retrieved additional signs from my vehicle with different wording that could not be construed to offer goods or services.

---

[1] The timestamped video reflects an hour earlier than the actual timing of the events. We use the actual time of events in discussing them. Please note the timestamp on Exhibits 1 and 6 reflects this time difference, showing a time an hour earlier than the actual events.

15. These signs contained messages such as "we will adopt your baby," "love your preborn neighbor as yourself," and "there may be time to save your baby, abortionpillreversal.com."

16. Despite this change in the content of my signs, Mr. Lenzini maintained that the signs remained in violation.

17. I then presented Mr. Lenzini with a digital copy of the written text of Carbondale Ordinance § 15.4.10.8, specifically pointing to the exception for First Amendment activity contained in § 15.4.10.8(A)(5)(a)(4).

18. I pointed out that this provision expressly states that it "is not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events."

19. When I asserted my First Amendment right to public demonstrations by stating, "I am demonstrating against abortion, I have a right to do that," Mr. Lenzini responded "No, you don't."

20. Mr. Lenzini displayed a text message from Defendant Snyder instructing him to pull up the signs.

21. At approximately 11:25 a.m., Mr. Lenzini began writing a citation for me after I refused to remove my signs based on my understanding of my First Amendment rights and the ordinance exceptions.

22. At approximately 11:34 a.m., City of Carbondale police officers arrived and provided yet another interpretation of the ordinance, telling me that the signs "can't be in the ground" but that I could "hold them and walk around."

23. The officers ambiguously added, "but I guess they can't be on the easement" – a term not defined or referenced in the relevant ordinance provisions.

24. I explained to the officers that holding signs while approaching vehicles to speak with or pray for individuals created a safety risk in windy conditions, as signs could potentially be blown into the street.

25. I asked the officers whether there would be any violation if I moved the signs twenty feet from the curb, as seemingly permitted by § 15.4.10.8(A)(3) of the ordinance.

26. The officers responded that there would be no violation if I did so, which introduced yet another interpretation of the ordinance's requirements.

27. Immediately contradicting the officers' understanding, Mr. Lenzini asserted that Mr. Snyder had instructed him that no signs whatsoever were allowed on public property, even when placed twenty feet from any street or right of way.

28. Mr. Lenzini indicated that if the signs were removed, no citation would be issued.

29. After consulting with my attorneys, I reluctantly capitulated to Mr. Lenzini's demands by removing my signs and no citation was ultimately issued.

30. The following day, April 17, 2025, I attempted to navigate the ordinance's ambiguities by seeking a permit.

31. Having read § 15.4.10.8(A)(5)(b)(2), which provides that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days" and that "[a] new permit shall be issued each time the temporary sign is to be displayed," I went to Carbondale City Hall to obtain such a permit.

32. I again wore my bodycam when I went to City Hall. The video I took that day is attached as Exhibit Six.

33.    Upon arrival at City Hall, I again encountered Mr. Lenzini, who issued a categorical denial that such a permit existed or could even be issued, despite the explicit language in the ordinance.

34.    Mr. Lenzini flatly refused to issue a permit to me, stating "you can only get a sign permit if you own the property" and "you can carry [the signs] like we told you yesterday."

35.    This interpretation that he gave me seemed to directly contradict § 15.4.10.8(A)(5)(b)(3), which expressly states that "[t]emporary signs need not be located on the site for which the event is to take place."

36.    I left City Hall without a permit or any clear direction on how to obtain one as seemingly provided for in the ordinance.

37.    Through counsel, I sent a demand letter on April 22, 2025, requesting written assurances by April 29, 2025, that I could demonstrate with temporary signs in compliance with the requirements set out in the ordinance.

38.    My attorney received a response to this demand letter on May 6, 2025, attached as Exhibit Seven. This response did not explain the scope of the ordinance.

39.    During my time advocating in Carbondale, I have observed numerous temporary signs throughout the city that appear to be in violation of the ordinance as it was explained to me, yet these signs remain undisturbed by city officials.

40.    I have documented several examples of these signs with photographs, which are attached to this declaration as Exhibits Eight through Twelve.

41.    To my knowledge, none of the owners of these signs have been approached by city officials or required to remove their signs, despite their placement in locations similar to or identical to where I was prohibited from placing my signs.

42. The ambiguity in the ordinance and its inconsistent enforcement have left me unable to determine how I can lawfully exercise my First Amendment rights.

43. I fear future citation, harassment, or other adverse action if I continue to attempt to exercise my constitutional rights through the use of temporary signs in my pro-life demonstrations.

44. This fear has created a substantial chilling effect on my protected speech and religious expression.

45. My inability to use temporary signs has significantly hindered my ability to effectively communicate my pro-life message, as the signs allow me to reach a broader audience, including those in passing vehicles who might not otherwise stop to speak with me.

46. Using handheld signs rather than placed signs also creates safety concerns when I am trying to engage with individuals in vehicles, as I must simultaneously hold the sign and attempt to have a conversation.

47. The enforcement actions against me are targeted specifically at my pro-life, religious message, as evidenced by the selective enforcement of the ordinance against me while permitting other temporary signs throughout the city.

48. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Declaration concerning myself, my activities, and my intentions are true and correct pursuant to 28 U.S.C. § 1746.

Executed on  5/8/2025 , 2025,

*Mark Brandon Hamman*
—69E1F6A32AAC496...

Brandon Hamman