## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRANDON HAMMAN,<br><br>*Plaintiff,*<br><br>v.<br><br>The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LENOARD JAMIE SNYDER, in his individual and official capacities,<br><br>*Defendants.* | Case No. 3:25-cv-00736-NJR<br><br>**Chief Judge Nancy J. Rosenstengel** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO LENOARD JAMIE SNYDER AND JOHN LENZINI'S PARTIAL MOTION TO DISMISS

Plaintiff Brandon Hamman, by and through counsel, files this Response to Defendants John Lenzini and Leonard Snyder's Motion to Dismiss (Doc. 25). Defendants' Motion to Dismiss fails at the threshold because it fundamentally misapplies the applicable legal standard and improperly seeks to resolve disputed factual questions that belong before a jury. Rather than confining their analysis to the four corners of the complaint—as Rule 12(b)(6) requires—Defendants ask this Court to rely on *their* assertions and bypass the discovery process. This approach transforms what should be a narrow pleading challenge into an attempt at summary judgment. Plaintiff has adequately alleged violations of clearly established constitutional rights, alleging that Carbondale's sign ordinance is unconstitutionally vague, fails narrow tailoring requirements, and has been selectively enforced against his religious viewpoints in violation of the First Amendment. These allegations, taken as true and viewed in the light most favorable to Plaintiff, state plausible claims for relief. Defendants' contrary arguments rest not on legal deficiencies in the pleadings,

but on factual disputes that must await resolution through the adversarial process of discovery and trial. The Court should deny Defendants' Motion to Dismiss.[1]

## STATEMENT OF FACTS

Plaintiff Brandon Hamman is a pro-life advocate who serves as a missionary and sidewalk counselor. Compl. ¶ 14. He is the founder of Gospel for Life, an organization under the authority of his church, Christ Church Carbondale, a 501(c)(3) non-profit organization. Compl. ¶ 34. Gospel for Life focuses on proclaiming the gospel and providing biblical counsel to women in crisis pregnancies. Compl. ¶ 35.

On April 16, 2025, Mr. Hamman and other demonstrators were peacefully demonstrating near the CHOICES Center for Reproductive Health at 600 N Giant City Road in Carbondale. Compl. ¶¶ 33, 36. Mr. Hamman was engaging in religious and political speech on open public land. Compl. ¶¶ 67–68. He unobtrusively demonstrated against abortion by placing small yard-sign-sized signs in the ground offering "free baby supplies" and other messages such as "please don't abort your baby" and "love your preborn neighbor like yourself." Compl. ¶ 140.

At approximately 11:00 a.m.,[2] Defendant John Lenzini, a Community Development Manager for the City of Carbondale, approached Mr. Hamman and declared that his signs were "in violation," according to City Attorney Jamie Snyder. Compl. ¶¶ 16, 37. Lenzini stated that he had "just talked to the city attorney and he told me the signs were in violation" and that "free baby supplies is not a demonstration." Compl. ¶ 40. When Mr. Hamman asserted his First Amendment right to public demonstrations, Lenzini responded, "No, you don't." Compl. ¶¶ 44–45.

---

[1] Although styled a full Motion to Dismiss, Defendants' Motion to Dismiss solely addresses Counts I–III and VII of Plaintiff's Complaint, ignoring Counts IV–VI. Accordingly, those counts remain regardless of this Court's ruling on the Partial Motion to Dismiss.
[2] The timestamped video reflects an hour earlier than the actual timing of the events. This Brief uses the actual time of events in discussing them.

Mr. Hamman retrieved other demonstrative signs from his car, including signs reading "we will adopt your baby," "love your preborn neighbor as yourself," and "there may be time to save your baby, abortionpillreversal.com." Compl. ¶¶ 41–42. He presented Lenzini with a written copy of the ordinance and its First Amendment exception for demonstrations. Compl. ¶ 43. Despite this, Lenzini showed Mr. Hamman a text from Defendant Snyder ordering him to remove the signs and began writing a citation when Mr. Hamman refused. Compl. ¶¶ 46–48.

When police officers arrived at 11:34 a.m., they told Mr. Hamman that the signs "can't be in the ground" and "can't be on the easement." Compl. ¶ 49. When Mr. Hamman asked whether moving the signs twenty feet from the curb (as permitted by the ordinance) would resolve the violation, the officers responded that there would be no violation. Compl. ¶¶ 51–52. However, Lenzini then contradicted this and told the officers that Snyder had instructed him that "there are no signs allowed on public property, even when twenty feet from any street or right of way." Compl. ¶ 53. After consulting with counsel, Mr. Hamman removed his signs to avoid citation. Compl. ¶ 55.

On April 17, 2025, Mr. Hamman went to Carbondale City Hall to obtain a sign permit for a 501(c)(3) organization as provided by the ordinance. Compl. ¶ 56. He again encountered Lenzini, who stated there was no such permit and that he would not issue one to Mr. Hamman. Compl. ¶¶ 57, 110. Lenzini asserted that "you can only get a sign permit if you own the property," contradicting the ordinance, which states that "[t]emporary signs need not be located on the site for which the event is to take place." Compl. ¶¶ 58–59.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; s*ee also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("Plaintiff must give enough details about the subject-matter of the case to present a story that holds together."). For the purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true, drawing all reasonable inferences from them in plaintiff's favor. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). A court must not grant a Rule 12(b)(6) motion merely because it does not believe the plaintiff's allegations. *Twombly*, 550 U.S. at 556.

## ARGUMENT

### I.      Preliminarily, Defendants cannot rely on material not before this Court.

Defendants seek to have this Court resolve disputed factual questions based on declarations and attachments that are outside the four corners of the Plaintiff's Complaint. Their Motion to Dismiss relies extensively on their own allegations about their conduct, actions, and motivations, such as Defendant Lenzini's declaration. These declarations and other evidentiary materials are not properly before the Court, which is limited to the Complaint itself.

The Seventh Circuit mandates that "[a] motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are ***critical*** to the complaint ***and referred to in it***, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (emphasis added); *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2020). Defendants do not argue the merits of their attachments and declarations or even attempt to show why their admission would satisfy any of the requirements the Seventh Circuit has laid out for the consideration of additional evidence at the pleading stage.

Defendants' submission and characterization of extraneous evidence not referenced in the Complaint violates the fundamental principle that, on a Rule 12 motion to dismiss, the Court must accept Plaintiff's version of the facts as true. By urging the Court to resolve factual disputes based on their unilateral interpretation of untested evidence, Defendants improperly seek summary judgment under the guise of a Rule 12(b)(6) motion. This approach denies Plaintiff the opportunity to conduct discovery, retain experts, or present his own interpretation of the evidence—fundamental due process protections that cannot be circumvented at the pleading stage. It similarly deprives Plaintiff of his right to have these sensitive questions of fact resolved by a jury of his peers. Instead, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (emphasis in original). In short, Defendants cannot dismiss this case based on their own ipse dixit.

## II. Plaintiff has adequately alleged a Constitutional violation of his clearly established rights that overcomes qualified immunity (Counts I–VI).[3]

Qualified immunity at the pleading stage is a narrow inquiry. "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2004) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). This is because resolving an assertion of qualified immunity involves a consideration of two factors: "(1) whether a constitutional right was violated *using plaintiff's version of the facts*, and (2) whether that right was clearly established at the time." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (citations omitted) (emphasis added); *see Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017);

---

3 Defendants do not clarify whether the Motion to Dismiss is filed on behalf of Defendants John Lenzini and Lenoard Jamie Snyder in their official capacity. If it is on their behalf in their official capacity, the Supreme Court has made very clear that qualified immunity is no bar to injunctive relief. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998).

Mr. Hamman has adequately alleged violations of clearly established rights that no reasonable official could have believed were lawful.

When the facts remain disputed or underdeveloped—as they invariably do at this early stage—the better course is to allow the constitutional violations to be tested against the full factual record that discovery will provide. The Seventh Circuit has emphasized that "[b]ecause a qualified immunity defense so closely depends 'on the facts of the case,' a 'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'" *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (quoting *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001)). This is because, with this Court's analysis limited to the narrow sources within the four corners of the complaint, "[t]hese sources rarely develop a robust factual record, given that, at the pleading stage, a plaintiff need only 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Archer v. Chisholm*, 870 F.3d 603, 612 (7th Cir. 2017)).

The Seventh Circuit has also made clear that "in many cases, the existence of qualified immunity will depend on the particular facts of a given case. In those cases, the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 (7th Cir. 2000). As Judge Easterbrook emphasized, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal." *Id.* at 775 (Easterbrook, J., concurring in part and concurring in the judgment).

A constitutional right's "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation and quotation marks omitted). A right can be clearly established without a case directly on point: "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," giving officials "fair warning" that their acts

are unconstitutional. *Id.* at 741 (citation and quotation marks omitted). Carbondale Revised Code § 15.4.10, et. seq. (hereinafter, the "Ordinance"), violates the First Amendment because it is (A) unconstitutionally vague, providing neither fair notice to citizens nor adequate guidance to enforcement officials; (B) not narrowly tailored to serve legitimate governmental interests, sweeping far more broadly than necessary to address traffic safety concerns; and (C) selectively enforced against religious viewpoints in violation of the constitutional prohibition on viewpoint-based discrimination.

### A. Plaintiff has sufficiently alleged that Carbondale's sign ordinance violates the constitutional prohibition against vague laws.

"Vague rules are overbroad because their scope is uncertain and . . . they tend to produce large chilling effects." *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023). A vague regulation of expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997). A statute can be impermissibly vague where it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A heightened standard of scrutiny is applied to vague laws that infringe upon First Amendment rights. *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (If "the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

### 1. The Ordinance's meaning is unknowable.

First, an ordinary reader cannot understand the meaning of the Ordinance when it contains no definition of "public right of way," leaving the permissibility of signs on public lands unclear and ambiguous. Defendants in their briefing have cited to definitions from a variety of places. However, none of these proposed definitions are contained within the Ordinance itself and the Defendants' meaning is far from the words' natural and ordinary understanding, rendering the Ordinance unconstitutionally vague.

Defendants rely on two inconsistent definitions of "right-of-way": *McClanahan v. City of Tumwater*, 2012 U.S. Dist. LEXIS 134208, *14–15 (W.D. Wash. Sep. 19, 2012) (defining it as "the strip of land owned by the public in which the street and appurtenant facilities will be constructed,") and the Illinois Highway Code (defining it as property under Illinois Department of Transportation's ("IDOT") jurisdiction, Ill. Admin. Code tit. 92, § 522.20). These inconsistent definitions—one referring to irrelevant state jurisdiction and the other a narrow street strip, neither of which applies to signs placed over twenty feet from the road—reinforce the unconstitutional vagueness. Defendants fail to explain why a Washington federal court decision or state-level IDOT definition would guide a municipal ordinance. Their interpretation leaves ordinary citizens in a Kafkaesque maze where they must somehow consult the Illinois Department of Transportation or a Federal District Court in Washington to understand what the Carbondale City Code means.

Rather than define "public right of way," as that term is used in § 15.4.10.8(A)(1), Defendants claim that *all public property* constitutes a "public right of way." *See* Def. Mtn. to Dismiss, Doc. 25, at 13 ("public property/public rights-of-way"). This argument is most evidenced by their discussion of the permitting process, where they quote from their own sample permits that "[s]igns shall be erected entirely on private property"—a restriction that appears nowhere in the

Ordinance, which contains no explicit prohibition on signs on all public property. Instead, what Defendants seem to be doing through this argument is identifying all public land as a public right of way.

"When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). There is a clear legal distinction, as to the ordinary and natural meaning, between a "public right of way" and "public property." "Public right of way" is "[t]he right of passage held by the public in general to travel on roads, freeways, and other thoroughfares," *Right of Way*, *Black's Law Dictionary* (12th ed. 2024) (subentry "Public Right of Way"), while "public property" more broadly means "State- or community-owned property not restricted to anyone individual's use or possession." *Property, Black's Law Dictionary* (12th ed. 2024) (subentry "Public Property").

Moreover, Carbondale's Code of Ordinances repeatedly makes use of the term "public property." *See, e.g.*, § 5-2-1 (regulating advertising on "public property"); § 2-5-5 (regulating possession and consumption of alcohol on "public property"). If Carbondale intended to forbid temporary signs on all public property, instead of only in "the public right of way," as § 15.4.10.8(A)(1) says, it would have used the term "public property," as it does in other areas of its Code. In addition, a prohibition of signs attached to "trees on public right of way," § 15.4.10.8(A)(2), makes no sense if the Ordinance bans all signs on public property.

Second, the Ordinance suffers from additional ambiguities. Section 15.4.10.8(A)(1) fails to specify what it means for a sign to be "erected on" the public right of way. The Ordinance also contains language appearing to exempt demonstrations from certain restrictions, stating it is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations," § 15.4.10.8(5)(a)(4), yet fails to articulate the scope of this exemption. Further

confusion stems from provisions regarding a permitting process for 501(c) organizations that on their face allow for exceptions for such organizations, without specifying the nature, scope, or availability of those exceptions. § 15.4.10.8(A)(5)(b)(2). The placement restrictions are similarly ambiguous; while one section prohibits temporary signs within twenty feet of the curb line (suggesting signs beyond this distance would be permitted), § 15.4.10.8(A)(3), city officials enforced the ordinance as a complete ban on any signs placed on public property.

This vagueness is further illustrated by the individual Defendants' own conduct and the City's fluctuating justifications. The City's first reason for suppressing Plaintiff's signs was that the signs were not demonstrative. Compl. ¶¶ 37–40. Then the City represented that the signs were merely not allowed on the "easement" near the street. Compl. ¶¶ 49–52. Only then did the City adopt the view that signs were completely prohibited on public property. Compl. ¶ 53. Defendants themselves fluctuated repeatedly in their understanding of the scope and effects of the Ordinance. If trained government officials charged with the enforcement of the Ordinance cannot understand it, ordinary citizens certainly cannot.

Simply put, the Ordinance is unconstitutionally vague because it uses multiple undefined or inconsistently applied terms. Its text is ambiguous, its enforcement inconsistent, and its ever-shifting meaning depends on who applies it. A law that leaves both citizens and officials guessing at what is permitted cannot stand.

### 2.  The Ordinance enables arbitrary enforcement.

The Constitution does not tolerate a law "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "The vague statutory language also leaves too much room for arbitrary and discriminatory enforcement, chilling plaintiffs who are reasonably concerned about over-enforcement." *Brown*, 86 F.4th at 774;

*see Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."). Further, a constitutional problem exists "when a licensing statute allegedly vests unbridled discretion in a governmental official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). Generally, a "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969).

The Ordinance, § 15.4.10.8(5)(a)(4), allows non-profit organizations to apply for permits to display temporary signs. It fails to articulate, however, any standard whereby permit requests are reviewed and approved. By authorizing permits for non-profits without articulating any standards for evaluation, the Ordinance grants unchecked discretion to government officials— precisely what the Constitution prohibits.

Defendants try to escape this problem by arguing that Plaintiff has failed to sufficiently show that he was acting on behalf of a 501(c)(3) organization. But that is precisely what he asserts in his Complaint: "Plaintiff is the founder of Gospel for Life, a non-profit organization under the authority of his church, Christ Church Carbondale, a 501(c)3 non-profit organization." Compl. ¶ 34. He also asserts that when he went to obtain a sign permit, he did so seeking "to obtain a sign permit for a 501(c)(3) organization to place signs." *Id.* ¶ 56. Defendants appear to challenge the credibility of the Complaint's allegations, but credibility determinations are not appropriate at the motion to dismiss stage. *See Denten v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 887 F. Supp.

176, 179 (N.D. Ill. 1995) (denying motion to dismiss that raised "factual disputes and credibility issues which are proper before a fact-finder, not within the scope of a motion to dismiss.").[4]

This case presents a textbook example of why the void-for-vagueness doctrine exists. Carbondale's Ordinance lacks clear definitions, offers no standards for permitting, and has been enforced inconsistently. When a municipality's own representatives cannot consistently explain what their ordinance prohibits, ordinary citizens have no way to comply. For these reasons, Carbondale's sign ordinance fails to satisfy the fundamental requirement of fair notice and must be struck down as unconstitutionally vague.

### B. Plaintiff has alleged sufficient facts to show the Ordinance is not narrowly tailored, nor does it leave open adequate alternatives for communication.

The location where Mr. Hamman exercised his constitutional rights to engage in pro-life speech, a grassy area owned by the public, was a public forum. Compl. ¶¶ 60–69. It is a traditional public forum, a place "which by long tradition or by government fiat has been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). In a traditional public forum, the government may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45. Narrow tailoring requires that it "promotes a substantial government interest that would be achieved less effectively absent the regulation," and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)

---

4 "Churches (including integrated auxiliaries and conventions or associations of churches) . . . are automatically considered tax exempt and are not required to apply for and obtain recognition of exempt status from the IRS." *Churches, Integrated Auxiliaries and Conventions or Associations of Churches*, IRS, https://www.irs.gov/charities-non-profits/churches-integrated-auxiliaries-and-conventions-or-associations-of-churches (last visited Aug. 11, 2025); 26 U.S.C § 508(C)(1)(A).

(citation omitted). The Ordinance, as applied to Mr. Hamman's speech as a blanket ban on all signs on all public property, is neither narrowly tailored nor does it leave open alternative channels for communication.

As discussed above, the City's Ordinance is vague and its tailoring is unclear and undefined. But if the Court agrees with the interpretation of Defendants that it is a total ban of signs on public property, it fails the narrow tailoring test for a simple reason: it prohibits far more speech than necessary to achieve the City's stated goals. Mr. Hamman was not blocking traffic or obstructing sight lines when he briefly placed small signs on a grassy area twenty feet from the nearest curb—yet the City's sweeping interpretation of its Ordinance treated his peaceful expression exactly the same as it would a large display of a thirty-foot-tall rat positioned directly in a roadway median. This kind of regulatory overkill is precisely what the narrow tailoring requirement is designed to prevent. When a government can point to no evidence that temporary signs placed well away from traffic pose any actual harm, yet still insists on banning them entirely from any and all public land, it has crossed the line from reasonable regulation into impermissible speech suppression. The constitutional principle at stake is simple: if the City wants to restrict speech in a public forum, it must do so with the precision of a scalpel, not the bluntness of a sledgehammer. *See Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 388 (6th Cir. 1996) (holding unconstitutional ordinances regulating the placement of signs in residential neighborhoods because they burdened "substantially more speech than necessary," despite city's "significant government interest" in aesthetics); *Tucker v. City of Fairfield*, 398 F.3d 457, 464 (6th Cir. 2005) ("There is no objective evidence in the record before us suggesting that the temporary placement of the balloon in the public right-of-way has any adverse effects, such as obstruction of pedestrian or automobile traffic. By applying the ordinance to prohibit the temporary use of the

balloon in this case, it therefore appears that the City has applied its ordinance in a manner that is 'substantially broader than necessary' to achieve its interests.").

In *Luce v. Town of Campbell*, 872 F.3d 512, 514 (7th Cir. 2017), the Seventh Circuit reversed a grant of summary judgment to a town for a 100 foot buffer zone that had been enacted near overpasses, emphasizing that "it is hard to see why signs off the highway, and too small to cause drivers to react, should be banned." *Id.* at 518. The exact same principle applies here. Mr. Hamman has alleged that he uses small temporary signs to convey his religious message, a constitutionally protected activity. No pedestrian or automobile traffic is obstructed by these small signs. Compl. ¶¶ 95-96. Accordingly, the application of the Ordinance to speech like that of Mr. Hamman by banning all signs on public land burdens far more speech than is necessary. In *Luce,* a 100-foot zone was unreasonable; here, the Defendants proffer a zone of all public land entirely.

Defendants rely on *Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1126 (7th Cir. 2019). While it is true that the Seventh Circuit concluded that an ordinance "was narrowly tailored to meet its stated purpose—the banning of anything on the public right-of-way that might obstruct vision or distract passing drivers," *Town of Grand Chute*, 915 F.3d at 1126, the analysis does not end there.

First, while there is much discussion in *Town of Grand Chute* of whether the large inflatable rodent fit the definition of a "sign," no party contested that the rat was in the "public right of way." The Union placed the rat on a median on the street. *Id.* at 1121. Those facts are inapplicable here. While Plaintiff himself was near a street, he was told to remove his signs that were *at least twenty feet from the curb line*. Compl. ¶¶ 51–53. At that location, Plaintiff's signs were in the middle of a small grassy area, well outside of any pedestrian or vehicular pathways, and posed no visual obstruction to traffic. Defendants invoke a case about a sign placed in a public road and right of

way to argue for the right to ban signs in all land owned by the government. *See Grand Chute*, 915 F.3d 1120. In other words, this Ordinance is simply not the ordinance at issue in *Grand Chute*, "a nondiscriminatory ban of all private signs from the public roads and rights-of-way." *Id.* at 1123 (citation omitted). An Ordinance banning signs on any and all land owned by the public is fundamentally different. Applying *Grand Chute* to all public land would be as incongruous as applying it to signs on private property.

Second, this is an as-applied analysis. Defendants' interpretation of their Ordinance, which remains unclear, seemingly prohibits even a small sign placed in the center of a grass field—or anywhere on public property—despite the sign being neither in a median, nor obstructing drivers' sight lines, nor permanently affixed to the ground. Under a narrow tailoring analysis, "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. As the Supreme Court has emphasized, "A complete ban can be narrowly tailored but only if **each** activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz,* 487 U.S. 474, 485 (1988) (emphasis added). Here, the City's interest in preventing obstruction does not align with Plaintiff's unobtrusive signs.

Moreover, the Ordinance does not leave open ample alternatives for communication. The Ordinance's enforcement prohibits all passive sign placement, regardless of size, distance, or obstruction on any public land whatsoever, effectively requiring speakers to physically bear the burden of their message at all times. That is not an "ample alternative" as required by *Perry*; it is no alternative at all. In *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994), the Supreme Court held that an ordinance which prohibited signs placed into the ground did not leave open ample alternative means of communication; the Court was "not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off." *Id.* Forcing persons to hold signs

for extended periods of time to make their message heard is distinctly different than allowing signs to be, albeit temporarily, laid on or placed in the ground. It also discriminates against those speakers who lack, or have a diminished capacity for, the physical ability to hold signs. The elderly, disabled, or those who wish to engage in a protest longer than their arms can literally bear are unable to find an alternative mode of communication under this Ordinance. As the Supreme Court highlighted, a "yard or window sign may have no practical substitute." *Id.* at 57. Moreover, the Defendants here refuse to allow Plaintiff to even apply for a permit for a sign, categorically denying him that alternative as well.

Plaintiff was not blocking roads, obstructing drivers, or creating hazards—he was simply exercising the most basic of constitutional rights in a traditional forum. Yet the Defendants' interpretation of their Ordinance would ban his speech entirely on any public land, offering no meaningful alternatives and drawing no distinctions based on actual harm. This is precisely the kind of regulatory overreach the narrow tailoring requirement forbids.

### C.    Plaintiff has alleged sufficient facts to show selective enforcement.

Viewpoint discrimination is incompatible with the First Amendment. As the Supreme Court has made clear: "[d]iscrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Id.* at 828 (citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96 (1972)).

Defendants have engaged in viewpoint discrimination in their enforcement of Carbondale Ordinance § 15.4.10.8, applying it uniquely and aggressively towards religious speakers because

of the viewpoint of their speech. Compl. ¶¶ 90, 91, 111, 113. These are factual allegations, supported by the Complaint and by evidence presented at the preliminary injunction stage, including exhibits showing signs expressing other viewpoints that were left undisturbed. Plaintiff will further substantiate these claims through discovery. Selective enforcement based on viewpoint is evidenced by Defendants' shifting justifications: the Defendants' first reasoning was that the signs were not demonstrative. Compl. ¶¶ 37–40. Then the Defendants represented that the signs were merely not allowed on the "easement" near the street. Compl. ¶¶ 49–52. Only then did Defendants adopt the view that signs were completely prohibited on public property. Compl. ¶ 53. Defendants themselves fluctuated repeatedly in their understanding of the scope and effects of the Ordinance. As the Seventh Circuit observed in *Hitchcock v. Angel Corps, Inc.*, "shifting explanations" can establish the "reasonable inference that they do not reflect the real reason" for an action. 718 F.3d 733, 738 (7th Cir. 2013). In other words, these shifting reasons demonstrate the Defendants' viewpoint discrimination.

Moreover, in Plaintiff's video of these events, incorporated into the Complaint by reference, *see Geinosky*, 675 F.3d at 745 n.1, the Defendants' discrimination is directly evidenced by a sign in the ground near the road for the restaurant Freddy's, similarly situated and comparable in size and shape to Plaintiff's signs, that was ignored entirely by Defendants until Plaintiff raised the issue. *See* Doc. 8-3, Plaintiff's April 16, 2025, Video, at 00:05:06. Defendants also demonstrated viewpoint discrimination in denying Plaintiff a permit for his nonprofit organization. Although § 15.4.10.8(A)(5)(b) expressly allows permits for 501(c)3s, Defendant Lenzini categorically refused to issue a permit to the Plaintiff. Compl. ¶ 57. Opportunities afforded to others were denied to him because of his religious pro-life message.

The sole question presented to this Court at this stage, as discussed above, is whether,

taking Plaintiff's allegations as true (including his allegations that Defendants have adopted a policy of viewpoint discrimination), Plaintiff has properly pleaded a claim under the First Amendment. Defendants attack this claim, not by arguing that the facts alleged are insufficient to state a claim, but that the facts Plaintiff has alleged are wrong. Defendants rely, not on a legal argument or cases, but on factual assertions made in Lenzini's declaration. These assertions are not properly before this Court. Lenzini has not been deposed nor his testimony tested through the adversarial process.

Defendants rely extensively on *Grand Chute*, where a town official testified to the number of signs he pulled from public rights of way over a year and verified that the signs were "safety hazards" because of the potential to block or interfere with traffic. *Constr. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute*, 297 F. Supp. 3d 850, 863 (E.D. Wis. 2018). But *Grand Chute* was resolved at the summary judgment stage. *Grand Chute*, 915 F.3d at 1122. The parties conducted extensive discovery before adversarial testimony from city officials resolved the question of discriminatory enforcement. Defendants may rely on *Grand Chute* by name, but not its actual analysis. In fact, the trial court in that case expressly emphasized the need for discovery to determine whether discrimination occurred when it first decided an injunction: "[t]he Union offered no evidence to support its assertion that the Town was somehow motivated by the content of its message. Of course, if such evidence surfaces later, the Union may renew its motion. On the record as it now stands, however, the court finds that the Town has not enforced its ordinance in a discriminatory manner." *Constr. & Gen. Laborer's Local Union No. 330 v. Town of Grand Chute*, 2014 U.S. Dist. LEXIS 59340, *13 (E.D. Wis. 2014). In *Grand Chute*, years of discovery were necessary to examine whether the defendant engaged in viewpoint discrimination. Defendants here

ask the Court to bypass all that discovery and adversarial testing and trust their factual assertion at the motion to dismiss stage. That is simply not how Rule 12 works.

At the pleading stage, Plaintiff need only allege facts that, if true, would establish a constitutional violation—which Plaintiff has done by alleging Defendants engage in viewpoint discrimination through selective enforcement of Ordinance § 15.4.10.8 against religious speech, and providing the above evidence of shifting justifications, unequal enforcement, and discrimination. The law is clear: viewpoint discrimination violates the First Amendment, allegations of such discrimination are sufficient to survive a motion to dismiss, and Defendants' motion should be denied so that Plaintiff may proceed to discovery where these allegations can be properly tested through the adversarial process.

### III.    Plaintiff has adequately alleged an Illinois RFRA claim. (Count VII).

The Illinois Religious Freedom Restoration Act ("IRFRA") prohibits the government from substantially burdening a person's exercise of religion unless the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 775 ILCS 35/15. Defendants' enforcement actions directly burden Plaintiff's sincere religious exercise.

Plaintiff has alleged that demonstrating against abortion and notifying individuals in crisis of other alternatives is integral to his religious practice. Compl. ¶ 139. Defendants have substantially burdened that practice by limiting Mr. Hamman's ability to carry signs that are part of the basic expression of his religious message. As discussed above, being prohibited from placing his signs on the ground constitutes a significant burden on his religious expression; he is unable to simultaneously carry the signs he needs to use to express his message and conduct his religious activity. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724–25 (2014), the Supreme Court emphasized that "federal courts have no business addressing" whether particular beliefs are

"insubstantial" and that courts should not "presume to determine . . . the plausibility of a religious claim."

Defendants claim that speech is not chilled by being prohibited from placing signs in the ground. But the medium is the message. The Supreme Court has emphasized that speech is burdened by not being allowed to place signs in the ground: even when analyzing real estate signs, the "options to which sellers realistically are relegated . . . involve more cost and less autonomy than 'For Sale' signs; are less likely to reach persons not deliberately seeking sales information, and may be less effective media for communicating the message that is conveyed by a 'For Sale' sign in front of the house to be sold, The alternatives, then, are far from satisfactory." *Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 93 (1977) (internal citations omitted).

The restriction forces Mr. Hamman to choose between core elements of his religious practice. He cannot simultaneously hold multiple signs necessary to convey his complete religious message, offer literature and materials to individuals, engage in prayer and counseling, and maintain the continuous presence his faith requires.

## **<u>CONCLUSION</u>**

WHEREFORE, Plaintiff moves this Court to Court deny the Defendants' Motion to Dismiss and grant such other relief as the Court deems just and proper.

Submitted: August 11, 2025

Respectfully submitted,

***<u>s/ Nathan J. Moelker</u>***
Nathan J. Moelker
Kelsey E. McGee
Christina A. Compagnone
Liam R. Harrell
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: kmcgee@aclj.org

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of August 2025, a true and correct copy of the above and foregoing document was filed electronically with the Clerk of the Court and was served upon all counsel of record via PACER.

*<u>/s/ Nathan J. Moelker</u>*
Nathan J. Moelker
*Counsel for Plaintiff*
