# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRANDON HAMMAN,<br><br>*Plaintiff,*<br><br>*v.*<br><br>The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LENOARD JAMIE SNYDER, in his individual and official capacities,<br><br>*Defendants*. | Case No. 3:25-cv-00736-NJR<br><br>**Chief Judge Nancy J. Rosenstengel** |

## PLAINTIFF'S RESPONSE TO CITY OF CARBONDALE'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**RESPONSE TO STATEMENT OF MATERIAL FACTS**..................................................**II**

**STATEMENT OF ADDITIONAL MATERIAL FACTS**.....................................**VI**

**INTRODUCTION**...............................................................................................**1**

**STANDARD OF REVIEW**..................................................................................**1**

**ARGUMENT**.......................................................................................................**2**

    **I.**   **The Defendant's Motion for Summary Judgment is premature.**.....................**2**

    **II.**  **The City has failed to evade liability for its constitutional violations under** ***Monell*****. (Counts I–VI).**.......................................................................**4**

        *a)*  *Carbondale's sign ordinance violates the constitutional prohibition against vague laws*...................................................................................*6*

           1.   The Ordinance's meaning is unknowable.......................................*6*

           2.   The Ordinance enables arbitrary enforcement.............................*10*

        *b)*  *The Ordinance is not narrowly tailored, nor does it leave open adequate alternatives for communication.*.......................................*12*

        *c)*  *The City has failed to prove that it has not engaged in viewpoint discrimination.*...................................................................................*16*

    **III.** **The City has failed to prove that there is no material dispute over Hamman's Illinois RFRA claim. (Count VII).**.....................................................**19**

**CONCLUSION**....................................................................................................**20**

## <u>RESPONSE TO STATEMENT OF MATERIAL FACTS</u>

1.     This case involves a dispute over the display of demonstration signs in front of an abortion clinic in Carbondale, Illinois. (Compl. ¶ 4).

**Admitted.**

2.     On April 16, 2025, Plaintiff was attempting to display anti-abortion related signs in front of the abortion clinic by staking them in the public right-of-way. (Compl. ¶¶ 4, 33, 36).

**Disputed.** The definition of "public right of way" is a question of law that remains in dispute. *See* Compl. ¶¶ 22-24.

3.     At that time, the City of Carbondale, through police and city officials, including Defendants Lenzini and Snyder, advised Plaintiff his signs staked into the ground violated the Ordinance. (Compl. ¶¶ 4, 37).

**Admitted.**

4.     Defendant Lenzini, the Community Development Manager, on advice from Defendant Snyder, the City Attorney, informed Plaintiff that he was not permitted to stake the signs in the right-of-way. (Compl. ¶¶ 16, 37-40, 45-46).

**Admitted** that Lenzini told Plaintiff he was not permitted to stake his signs; **disputed** insofar as the statement implies that the location of the signs was within the "public right of way." *See* Compl. ¶ 53.

5.     Plaintiff was informed that he was permitted to walk around while holding the signs instead. (Compl. ¶ 49).

**Admitted.**

6.     After some back and forth between Plaintiff, police officers, and Lenzini, Plaintiff eventually removed the signs and no citation was issued. (Compl. ¶¶ 49-55).

**Admitted.**

7.    Plaintiff and others present at the time of the incident continued, without incident, to exercise their First Amendment rights thereafter by holding their signs and walking around with them. [Doc. 17-1, ¶ 6] ("Lenzini Declaration").

**Admitted,** insofar as the statement does not imply that the First Amendment rights of the demonstrators were not substantially chilled by the threatened enforcement.

8.    The events of April 16, 2025 occurred entirely on the public right-of-way, as evidenced by City of Carbondale site plan drawing and photographs from the location of the incident. (Lenzini Declaration, ¶ 7) (Second Lenzini Declaration, ¶ 3-7).

**Disputed. Not supported by record citation.** Citations may demonstrate that the events of April 16, 2025, occurred on public property, but none of the citations define or show the extent of "public right of way," provide a definition, or prove that the events in question occurred on a right of way. *See* Compl. ¶ 27 ("[B]ecause § 15.4.10.8(A)(1) does not specify its definition of 'right of way,' the scope of its prohibition is unclear.").

9.    The next day, on April 17, 2025, Plaintiff came to Carbondale's City Hall to attempt to obtain a temporary signage permit meant for 501(c) organizations. (Compl. ¶ 56).

**Admitted.**

10.    Plaintiff claims that he is a "founder" of Gospel for Life, a non-profit organization under the authority of his church, Christ Church Carbondale, a 501(c) non-profit organization. (Compl. ¶ 34).

**Admitted.**

11.    Defendant Lenzini was present at City Hall on April 17, 2025 and told Plaintiff that such a permit did not exist, and Plaintiff ultimately did not obtain a permit. (Compl. ¶¶ 57- 58, 60).

**Admitted,** insofar as the statement does not imply that Defendant Lenzini's statement was necessarily an accurate or controlling statement of law.

12.    15.4.10.8(A)(1) of the Ordinance states clearly that "[n]o sign may be erected on, suspended over, or encroach upon the public right of way[.]" (Compl. ¶ 22) (Lenzini Declaration, ¶ 9).

**Admitted.**

13.    The Ordinance has been adopted for the dual purposes of pedestrian and traffic safety, as well as to maintain the visual character of the city. (Lenzini Declaration, ¶ 3).

**Disputed. Not supported by the record citation.** There is no foundation supporting the idea that Defendant Lenzini is able to speak to the subjective reasoning of the multi-member body that adopted the Ordinance, nor is there any reason to believe that this is not mere speculation on Defendant Lenzini's part. Nothing in the Ordinance itself shows a purpose for the Ordinance. *See* Ordinance, § 15.4.10.8; Compl. ¶¶ 94-95.

14.    The Ordinance does not allow temporary permits to be issued for signs on public rights-of-way. (Lenzini Declaration, ¶ 10).

**Disputed and not supported by the record citation.** The Ordinance does not state this on its face. Compl. ¶ 59; Ordinance § 15.4.10.8(A)(5)(b)(3). This is one non-expert individual's interpretation of the Ordinance, objected to as a legal conclusion, and the interpretation of the Ordinance itself is in dispute. Compl. ¶ 57.

15.    It is the City of Carbondale's practice to remove all signs in violation of the Ordinance when they are noticed. (Lenzini Declaration, ¶ 11).

**Disputed.** The veracity of Lenzini's statements is disputed, including by the declarations and testimony of Plaintiff Hamman. *See* Hamman Declaration of May 8, 2025, (Doc. 8-1), at ¶¶ 39-41.

16.    If a citizen reports a sign in violation of the Ordinance, city officials respond to each complaint without discriminating based on content of the sign or identity of the speaker. (Lenzini Declaration, ¶ 12).

**Disputed.** The veracity of Lenzini's statements is disputed, including by the declarations and testimony of Plaintiff Hamman. *See* Hamman Declaration of May 8, 2025, (Doc. 8-1), at ¶¶ 39-41.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1.    Plaintiff Brandon Hamman serves as a missionary and sidewalk counselor through Gospel for Life, a non-profit organization operating under the authority of Christ Church Carbondale, a 501(c)(3) organization. Hamman Decl., Doc. 8-1, ¶ 3.

2.    The location where Hamman exercised his constitutional rights to engage in pro-life speech was a grassy area owned by the public, constituting a public forum. Hamman Decl., Doc. 8-1, ¶ 6.

3.    Hamman placed signs for a portion of the time he engaged in his activity at least twenty feet from the curb line in the middle of a small grassy area, well outside of any pedestrian or vehicular pathways, where they posed no visual obstruction to traffic. Hamman Decl., Doc. 8-1, ¶ 25; ¶ 8.

4.    The City's first reasoning for prohibiting Hamman's signs was that the signs were not demonstrative. Hamman Decl., Doc. 8-1 ¶¶ 12-14.

5.    The City then represented that the signs were merely not allowed on the "easement" near the street. Hamman Decl., Doc. 8-1, ¶¶ 23-26.

6.    Only after these shifting justifications did the City adopt the view that signs were completely prohibited on public property. Hamman Decl., Doc. 8-1, ¶ 27.

7.    When Hamman went to obtain a sign permit on April 17, 2025, he sought to obtain a permit for a 501(c)(3) organization to place signs. Hamman Decl., Doc. 8-1, ¶¶ 30-31.

8.    Defendant Lenzini refused to issue a permit to Hamman for his non-profit organization. Hamman Decl., Doc. 8-1, ¶ 34.

9.      During the April 16, 2025, incident, a police officer acknowledged on body camera footage that "the Ordinance could be written better." Def. Pre. Inj. Ex. 2 (Time Stamp 11:58:30-34).

10.     At another point during the incident, an officer told Lenzini, "honestly, it is kind of poorly written." Def. Pre. Inj. Ex. 3 (Time Stamp 11:35:56-60).

11.     On April 16, 2025, police officers told Hamman's pastor that to have a sign "anywhere on city property . . . . you have to have a permit or authorization," and to go to city hall to seek that authorization. Def. Pre. Inj. Ex. 4 (Time Stamp 12:06:57-07:04).

12.     When Hamman's pastor pointed out that the message of the signs would not be acceptable because of their viewpoint, the police officer agreed, stating: "They would not condone this because ideologically I would guess they would not want these here. But you could say something that was completely different and I am sure . . ." Def. Pre. Inj. Ex. 4 (Time Stamp 12:07:15-07:27).

13.     Sergeant Murray acknowledged directly on body camera footage: "I am sure it is viewpoint discrimination. . . . But if you are allowing some signs and not others, I am sure. If I was in charge of it I would say no political signs whatsoever, that way you cannot say, ok I allowed these people and didn't allow these people." Def. Pre. Inj. Ex. 2 (Time Stamp 12:07:49-08:05).

14.     Text messages from Defendant Lenoard Snyder show Mr. Snyder specifically asking Defendant Lenzini about Hamman's viewpoint, asking if it was "coalitionnlife," a reference to a pro-life organization. Def. Pre. Inj. Ex. 8 at 6.

15.     In body camera footage, Defendant Snyder also asked police officer Sergeant Mark Murray about Hamman's organizational affiliation, with the officer responding that he doesn't know the official organization. Def. Pre. Inj. Ex. 2 (Time Stamp 11:47:23-43).

16.    During the April 16, 2025, incident, there was a sign in the ground near the road for the restaurant Freddy's, similarly situated and comparable in size and shape to Hamman's signs, that was ignored entirely by Defendants until Hamman raised the issue. Doc. 8-3, Hamman's April 16, 2025, Video, at 00:05:06.

17.    Hamman has observed and documented with photographs several small temporary signs on public property all over the City of Carbondale, for which Defendants do not enforce the Ordinance at all, but have a policy of inaction. Hamman Decl., Doc. 8-1, ¶¶ 40-43.

18.    Hamman's inability to use temporary signs has significantly hindered his ability to effectively communicate his pro-life message, as the signs allow him to reach a broader audience, including those in passing vehicles who might not otherwise stop. Hamman Decl., Doc. 8-1, ¶ 45.

19.    Handheld signs would create safety concerns, as Hamman tries to both engage people in his religious conversation and hold the signs conveying his message. Hamman Decl., Doc. 8-1, ¶ 46.

20.    The Ordinance contains no definition of "public right of way," leaving the permissibility of signs on public lands unclear and ambiguous. Ordinance § 15.4.10.8.

21.    The Ordinance contains language appearing to exempt demonstrations from certain restrictions, stating it is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations," yet fails to articulate the scope of this exemption. Ordinance § 15.4.10.8(5)(a)(4).

22.    The Ordinance contains provisions regarding a permitting process for 501(c) organizations without specifying the nature, scope, or availability of those exceptions. Ordinance § 15.4.10.8(A)(5)(b)(2).

23.     While one section of the Ordinance prohibits temporary signs within twenty feet of the curb line, suggesting signs beyond this distance would be permitted, city officials enforced the ordinance as a complete ban on any signs placed on public property. Ordinance § 15.4.10.8(A)(3); Hamman Decl., Doc. 8-1, ¶ 27.

## INTRODUCTION

Plaintiff Brandon Hamman, by and through counsel, respectfully files this Response to the City of Carbondale's Motion for Summary Judgment, Doc. 26. With all questions of fact resolved in Hamman's favor, the City cannot demonstrate that it is entitled to judgment at this early stage, before the benefit of any discovery. In support of his response, Hamman relies on his Declaration and the exhibits thereto submitted in support of his Motion for a Preliminary Injunction. (Doc. 8-1, 8-2, and 8-3). Hamman also relies on body camera footage of the three police officers present at the scene, (Def. Pre. Inj. Exhibits 2 through 4) attached hereto, and texts from Defendant Lenoard Snyder (Def. Pre. Inj. Exhibit 8), attached hereto, all submitted as evidence by the City in support of its Response to Plaintiff's Motion for a Preliminary Injunction.[1]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 governs the standard of review for summary judgment motions, stating that they should not be granted unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. All the evidence is to be construed "in the light most favorable to the non-moving party." *Myers v. Hasara*, 226 F.3d 821, 825 (7th Cir. 2000) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). The Court must also "draw all reasonable and justifiable inferences in favor of that party." *Id.* The Supreme Court has made clear that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed[.]" *Anderson*, 477 U.S. at 255.

---

[1]Although styled a full Motion for Summary Judgment, the City's Motion solely addresses Counts I-III and VII of Plaintiff's Complaint, ignoring Counts IV-VI. Accordingly, those counts remain regardless of this Court's ruling on the Partial Motion for Summary Judgment.

**ARGUMENT**

The City's Motion should be denied because genuine issues of material fact exist regarding the constitutionality of Carbondale Revised Code § 15.4.10, et seq. (hereinafter, the "Ordinance"), both in regard to the Ordinance's facial validity and in its application to Hamman. The City's attempt to avoid *Monell* liability before any discovery is premature and not supported by the record.

I.    **Defendant's Motion for Summary Judgment is premature.**

Although Rule 56 of the Federal Rules of Civil Procedure allows a party to file a motion for summary judgment "at any time," that same rule also allows the court, as is just, to deny the motion or order a continuance for the opposing party to allow for sufficient discovery. Fed. R. Civ. P. 56. *See also* Fed. R. Civ. P. 56, Advisory Comm.'s Notes (2010 Amendments, Note to Subdivision (b)). The City's Motion for Summary Judgment suffers from a fundamental procedural defect: it seeks to short-circuit the litigation process by requesting dispositive relief before any discovery has been conducted. The timing of the City's motion undermines the adversarial process and denies Hamman the fair opportunity to prove his constitutional claims through the development of material facts that can only be ascertained through discovery.

Many courts have denied pre-discovery motions for summary judgment as premature despite technical compliance with the timing provisions of Rule 56. *See Gakuba v. Henderson*, No. 19-CV-1273, 2020 U.S. Dist. LEXIS 73247, at *2 (S.D. Ill. Apr. 27, 2020) ("While a motion for summary judgment may be filed at any time, it is not an abuse of discretion for a Court to conclude that the motion is premature when filed before defendants have answered."); *M.J. v. Carbondale Elem. Sch.*, 2016 U.S. Dist. LEXIS 1726, *5 (S.D. Ill. 2016) ("With such little information in the record, the Court cannot say that there is no genuine issue of material fact concerning the

suspension claim, so the motion for summary judgment must be denied without prejudice."); *Nadir v. Sec.*, 2024 U.S. Dist. LEXIS 24761, *5 (S.D. Ind. 2024) (Denying a motion for summary judgment as premature because "[t]he parties have not had the opportunity to make initial disclosures, depose witnesses, or complete discovery."); *Mitchell v. Green Bay Corr. Inst.*, 2023 U.S. Dist. LEXIS 145039, *1-2 (E.D. Wis. 2023) ("As an initial matter, the court will deny Mitchell's motion for summary judgment as premature. Defendants have not yet filed an answer, and there has been no discovery conducted to obtain the relevant facts to decide the motion.").

Likewise, here, no written discovery has been conducted, no depositions have occurred, and there have been no opportunities to test or prove Hamman's claims. The City's primary case to justify summary judgment is *Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1122-23 (7th Cir. 2019). There, summary judgment motions were filed a year after the case was filed, allowing full discovery, including depositions. *Constr. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute*, 2015 U.S. Dist. LEXIS 183819, *5 (E.D. Wis. 2015). There is no indication in that case's procedural history that Grand Chute sought to bypass the discovery process. On the contrary, it was only after ample and careful discovery that the plaintiff's claims were tested and reviewed by the courts.

Here, crucial fact questions require discovery in order for this Court to adjudicate Hamman's claims. For example, whether Defendants discriminated based on Hamman's viewpoint is a fact question to be tested through the adversarial process. *Grand Chute* itself made that point clear. 2014 U.S. Dist. LEXIS 59340, *13 ("The Union offered no evidence to support its assertion that the Town was somehow motivated by the content of its message. Of course, if such evidence surfaces later, the Union may renew its motion."). Likewise, whether the Ordinance is narrowly

tailored in its application to Hamman's small and unobtrusive signs is a factual question that the City must affirmatively establish through evidence gathered in discovery.

In short, the City's Motion for Summary Judgment is premature and should be denied. Discovery is required to develop the factual record. Critical questions regarding the Ordinance's viewpoint discrimination and the narrow tailoring of the Ordinance as applied to Hamman's specific circumstances need to be resolved through the discovery process. Justice requires that Hamman be afforded the same opportunity for thorough discovery that benefited the parties in *Grand Chute* before any dispositive ruling on the merits.

## II.    **The City has failed to evade liability for its constitutional violations under *Monell* (Counts I–VI).**

The City cannot use *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978) to evade liability here. Hamman's case includes a facial challenge to an Ordinance of the City. No court has ever issued the bold suggestion that a duly enacted ordinance of a municipality does *not* constitute the policy of that municipality. The Supreme Court, in a case Defendants cite, has made clear that more than one incident of a constitutional violation is relevant "where the policy relied upon is not itself unconstitutional." *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). A single constitutional violation pursuant to an unconstitutional policy is enough.

Moreover, for *Monell*, the City's Motion hinges on two contradictory positions. On the one hand, the City repeatedly relies on the declarations of Defendant Lenzini as the definitive source of truth regarding its policies, practices, and even the precise location of the "public right-of-way." *See* City of Carbondale's Statement of Material Facts (Doc. 26) at ¶¶ 3, 15. On the other hand, the City argues that Lenzini's actions on April 16, 2025, do not give rise to *Monell* liability because it claims they were an isolated incident and did not stem from an official policy. City Mtn. for Summary Judgment, Doc. 26, at 6. The City cannot hold Lenzini out as its official spokesperson

and policymaker for the purposes of this litigation, citing his interpretations as authoritative, while simultaneously disavowing his actions in the field as those of a rogue employee.

Where a municipality delegates authority to, and relies upon, an official for the implementation of policy, and where that official exercises that authority in an unconstitutional manner, liability under *Monell* is proper. *See Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009). A municipality can be held liable for the actions of "those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under section 1983." *Monell*, 463 U.S. at 694. That is precisely the case here.

Lenzini, as the Community Development Manager, was acting under the color of law and exercising final policymaking authority when he repeatedly restricted Hamman's speech. His declarations, submitted by the City, confirm that his actions were a direct enforcement of the City's understanding of the Ordinance. The City is liable under *Monell* because it has officially ratified Lenzini's conduct. The City has presented Lenzini's perspective as the City's official stance, effectively adopting his interpretation and enforcement of the Ordinance as its own policy. *See, e.g.,* City of Carbondale's Statement of Material Facts (Doc. 26) at ¶¶ 3, 15. For this reason, the City's attempt to avoid *Monell* liability is meritless. The constitutional violations suffered by Hamman were the direct result of the City's official policy and the actions of a policymaker whose authority the City now endorses.

It is well-established that a municipality may be held liable under 42 U.S.C. § 1983 for a single act by a policymaking official, or for an unconstitutional policy, practice, or custom. *See Monell*, 436 U.S. at 694. Because the City's Ordinance is the source of Hamman's injury, and because its agents acted in accordance with that Ordinance, the City is subject to *Monell* liability. The Ordinance violates the First Amendment because it is (A) unconstitutionally vague, providing

5

neither fair notice to citizens nor adequate guidance to enforcement officials; (B) not narrowly tailored to serve legitimate governmental interests, sweeping far more broadly than necessary to address traffic safety concerns; and (C) selectively enforced against religious viewpoints in violation of the constitutional prohibition on viewpoint-based discrimination.

### a) **Carbondale's sign ordinance violates the constitutional prohibition against vague laws.**

"Vague rules are overbroad because their scope is uncertain and . . . they tend to produce large chilling effects." *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023). A vague regulation of expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997). A statute can be impermissibly vague where it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A heightened standard of scrutiny applies to vague laws infringing upon First Amendment rights. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (If "the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

### 1. The Ordinance's meaning is unknowable.

First, an ordinary reader cannot understand the meaning of the Ordinance when it contains no definition of "public right of way," leaving the permissibility of signs on public lands unclear and ambiguous. Defendants in their briefing have cited to definitions from a variety of sources. However, none of these proposed definitions are contained within the Ordinance itself and Defendants' understanding of "public right of way" is far different than the term's natural and ordinary understanding, rendering the Ordinance unconstitutionally vague.

The City relies on two inconsistent definitions of "right-of-way": *McClanahan v. City of Tumwater*, 2012 U.S. Dist. LEXIS 134208, *14–15 (W.D. Wash. Sep. 19, 2012) (defining it as "the strip of land owned by the public in which the street and appurtenant facilities will be constructed") and the Illinois Highway Code (defining it as property under Illinois Department of Transportation's ("IDOT") jurisdiction, Ill. Admin. Code tit. 92, § 522.20). These inconsistent definitions—one referring to irrelevant state jurisdiction and the other a narrow street strip, neither of which applies to signs placed over twenty feet from the road—reinforce the unconstitutional vagueness. The City fails to explain why a Washington federal court decision or state-level IDOT definition would guide a municipal ordinance. Its interpretation leaves ordinary citizens in a Kafkaesque maze where they must somehow consult the Illinois Department of Transportation or a federal district court in Washington to understand what the Carbondale City Code means.

Rather than define "public right of way," as that term is used in § 15.4.10.8(A)(1), the City claims that *all public property* constitutes a "public right of way." *See* City Mtn. for Summary Judgment, Doc. 26, at 15-16 ("[T]he Ordinance does not allow placement of signs on a public right-of-way via permit. . . . [E]ven if the exception for 501(c) organizations applied to public property . . ."). This argument is most evidenced by the City's discussion of the permitting process, where it quotes from its own sample permits that "[s]igns shall be erected entirely on private property"—a restriction that appears nowhere in the Ordinance, which contains no explicit prohibition on signs on all public property. Instead, what the City seems to be doing through this argument is identifying all public land as a public right of way.

To try to support this claim, the City cites Lenzini's analysis of a "Site Plan" of the area. *Id*. (citing Second Lenzini Declaration, Doc. 26-3, at ¶¶ 3-7). However, this Site Plan never uses the term "public right of way," nor does it demonstrate IDOT jurisdiction. *Id.* Instead, Lenzini

7

claims that *everything* beyond the private property line is "the right-of-way." *Id*. at ¶ 4. No basis is provided for this claim. Both of the definitions offered by the City would *not* include the grass in question, since it contains neither the street nor any "appurtenant facilities," nor has the City shown IDOT jurisdiction. In *Town of Grand Chute*, another case extensively relied upon by the City, the term was defined to mean "the portion of a street or median set aside for public uses, such as street expansion, water mains, sewer pipes, and utilities," similarly not including the area in question. *Constr. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute*, 834 F.3d 745, 753 (7th Cir. 2016).

"When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993); *See also United States v. Castleman*, 572 U.S. 157, 162 (2014) ("It is a settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'") (quoting *Sekhar v. United States*, 570 U.S. 729, 732 (2013)). There is a clear legal distinction, as to the ordinary and natural meaning, between a "public right of way" and "public property." "Public right of way" is "[t]he right of passage held by the public in general to travel on roads, freeways, and other thoroughfares," *Right of Way*, *Black's Law Dictionary* (12th ed. 2024) (subentry "Public Right of Way"), while "public property" more broadly means "State- or community-owned property not restricted to anyone individual's use or possession." *Property, Black's Law Dictionary* (12th ed. 2024) (subentry "Public Property").

Moreover, Carbondale's Code of Ordinances repeatedly makes use of the term "public property." *See, e.g.*, § 5-2-1 (regulating advertising on "public property"); § 2-5-5 (regulating possession and consumption of alcohol on "public property"). If Carbondale intended to forbid temporary signs on all public property, instead of only in "the public right of way," as

§ 15.4.10.8(A)(1) says, it would have used the term "public property," as it does in other areas of its Code. In addition, a prohibition of signs attached to "trees on public right of way," § 15.4.10.8(A)(2), makes no sense if the Ordinance bans all signs on public property.

Second, the Ordinance suffers from additional ambiguities. Section 15.4.10.8(A)(1) fails to specify what it means for a sign to be "erected on" the public right of way. The Ordinance also contains language appearing to exempt demonstrations from certain restrictions, stating it is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations," § 15.4.10.8(5)(a)(4), yet fails to articulate the scope of this exemption. Further confusion stems from provisions regarding a permitting process for 501(c) organizations that on their face allow for exceptions for such organizations, without specifying the nature, scope, or availability of those exceptions. § 15.4.10.8(A)(5)(b)(2). The placement restrictions are similarly ambiguous; while one section prohibits temporary signs within twenty feet of the curb line (suggesting signs beyond this distance would be permitted), § 15.4.10.8(A)(3), city officials enforced the Ordinance as a complete ban on any signs placed on public property.

This vagueness is further illustrated by the individual Defendants' own conduct and the City's fluctuating justifications. The City's first reason for suppressing Hamman's signs was that the signs were not demonstrative. Hamman Decl. ¶¶ 12-14. Then the City represented the signs were merely not allowed on the "easement" near the street. *Id.* ¶¶ 25-26. Only then did the City adopt the view that signs were completely prohibited on public property. *Id.* ¶ 27. Defendants themselves fluctuated repeatedly in their understanding of the scope and effects of the Ordinance. Even the officers themselves acknowledged the Ordinance's ambiguities. One officer said that "the Ordinance could be written better," Def. Pre. Inj. Ex. 2 (Time Stamp 11:58:30-34). At another point, an officer told Lenzini, "honestly, it is kind of poorly written." Def. Pre. Inj. Ex. 3 (Time

Stamp 11:35:56-60). If trained government officials charged with the enforcement of the Ordinance cannot understand it, ordinary citizens certainly cannot.

Simply put, the Ordinance is unconstitutionally vague because it uses multiple undefined or inconsistently applied terms. Its text is ambiguous, its enforcement inconsistent, and its ever-shifting meaning depends on who applies it. A law that leaves both citizens and officials guessing at what is permitted cannot stand.

### 2. The Ordinance enables arbitrary enforcement.

The Constitution does not tolerate a law "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "The vague statutory language also leaves too much room for arbitrary and discriminatory enforcement, chilling plaintiffs who are reasonably concerned about over-enforcement." *Brown*, 86 F.4th at 774; *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."). Further, a constitutional problem exists "when a licensing statute allegedly vests unbridled discretion in a governmental official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). Generally, a "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969).

The Ordinance, § 15.4.10.8(5)(a)(4), allows non-profit organizations to apply for permits to display temporary signs. It fails to articulate, however, any standard whereby permit requests are reviewed and approved. By authorizing permits for non-profits without articulating any

standards for evaluation, the Ordinance grants unchecked discretion to government officials—precisely what the Constitution prohibits.

Defendants try to escape this problem by arguing that Hamman has failed to sufficiently show that he was acting on behalf of a 501(c)(3) organization. But that is precisely what he asserts in his declaration, stating he "serves as a missionary and sidewalk counselor through Gospel for Life, a non-profit organization operating under the authority of Christ Church Carbondale, a 50l(c)(3) organization." Hamman Decl. ¶ 3. Hamman also asserts that when he went to obtain a sign permit, he did so seeking to obtain a sign permit for a 501(c)(3) organization to place signs. *Id.* ¶¶ 30-1. Defendants appear to challenge Hamman's credibility, but credibility determinations are not appropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 255.[2]

Drawing all material questions of fact in the light most favorable to Hamman, the City simply has not met its summary judgment burden to prevail on a vagueness challenge. This case presents a textbook example of why the void-for-vagueness doctrine exists. Carbondale's Ordinance lacks clear definitions, offers no standards for permitting, and has been enforced inconsistently. When a municipality's own representatives cannot consistently explain what their ordinance prohibits and even acknowledge the ordinance's vagueness, ordinary citizens have no way to comply. For these reasons, Carbondale's sign Ordinance fails to satisfy the fundamental requirement of fair notice and must be struck down as unconstitutionally vague.

---

[2] "Churches (including integrated auxiliaries and conventions or associations of churches) . . . are automatically considered tax exempt and are not required to apply for and obtain recognition of exempt status from the IRS." *Churches, Integrated Auxiliaries and Conventions or Associations of Churches*, IRS, https://www.irs.gov/charities-non-profits/churches-integrated-auxiliaries-and-conventions-or-associations-of-churches (last visited Aug. 11, 2025); 26 U.S.C § 508(C)(1)(A).

b) **The Ordinance is not narrowly tailored, nor does it leave open adequate alternatives for communication.**

The location where Hamman exercised his constitutional rights to engage in pro-life speech, a grassy area owned by the public, was a public forum. *See* Hamman Decl. ¶ 6. It is a traditional public forum, a place "which by long tradition or by government fiat has been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). In a traditional public forum, the government may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45. Narrow tailoring requires that it "promotes a substantial government interest that would be achieved less effectively absent the regulation," and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (citation omitted). The Ordinance, as applied to Hamman's speech as a blanket ban on all signs on all public property, is neither narrowly tailored nor does it leave open alternative channels for communication.

As discussed above, the City's Ordinance is vague and its tailoring is unclear and undefined. But if the Court agrees with the interpretation of Defendants that it is a total ban of signs on public property, it fails the narrow tailoring test for a simple reason: it prohibits far more speech than necessary to achieve the City's stated goals. Hamman was not blocking traffic or obstructing sight lines when he briefly placed small signs on a grassy area twenty feet from the nearest curb, *see* Hamman Decl. ¶ 8—yet the City's sweeping interpretation of its Ordinance treated his peaceful expression exactly the same as it would a large display of a thirty-foot-tall rat positioned directly in a roadway median. This kind of regulatory overkill is precisely what the narrow tailoring requirement is designed to prevent. When a government can point to no evidence

that temporary signs placed well away from traffic pose any actual harm, yet still insists on banning them entirely from any and all public land, it has crossed the line from reasonable regulation into impermissible speech suppression. The constitutional principle at stake is simple: if the City wants to restrict speech in a public forum, it must do so with the precision of a scalpel, not the bluntness of a sledgehammer. *See Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 388 (6th Cir. 1996) (holding unconstitutional ordinances regulating the placement of signs in residential neighborhoods because they burdened "substantially more speech than necessary," despite city's "significant government interest" in aesthetics); *Tucker v. City of Fairfield*, 398 F.3d 457, 464 (6th Cir. 2005) ("There is no objective evidence in the record before us suggesting that the temporary placement of the balloon in the public right-of-way has any adverse effects, such as obstruction of pedestrian or automobile traffic. By applying the ordinance to prohibit the temporary use of the balloon in this case, it therefore appears that the City has applied its ordinance in a manner that is 'substantially broader than necessary' to achieve its interests.").

In *Luce v. Town of Campbell*, 872 F.3d 512, 514 (7th Cir. 2017), the Seventh Circuit reversed a grant of summary judgment to a town for a 100 foot buffer zone that had been enacted near overpasses, emphasizing that "it is hard to see why signs off the highway, and too small to cause drivers to react, should be banned." *Id.* at 518. The exact same principle applies here. Hamman has alleged that he uses small temporary signs to convey his religious message, a constitutionally protected activity. No pedestrian or automobile traffic is obstructed by these small signs. Hamman Decl. ¶ 8. Accordingly, the application of the Ordinance to speech like that of Hamman by banning all signs on public land burdens far more speech than is necessary. In *Luce*, a 100-foot zone was unreasonable; here, Defendants proffer a zone of all public land entirely.

13

Defendants rely on *Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1126 (7th Cir. 2019). While the Seventh Circuit concluded that an ordinance "was narrowly tailored to meet its stated purpose—the banning of anything on the public right-of-way that might obstruct vision or distract passing drivers," *id.*, the analysis does not end there.

First, while there is much discussion in *Grand Chute* of whether the large inflatable rodent fit the definition of a "sign," no party contested that the rat was in the "public right of way." The Union placed the rat on a median on the street. *Id.* at 1121. Those facts are inapplicable here. While Hamman himself was near a street, he was told to remove his signs that were *at least twenty feet from the curb line*. Hamman Decl. ¶ 28. At that location, Hamman's signs were in the middle of a small grassy area, well outside of any pedestrian or vehicular pathways, and posed no visual obstruction to traffic. Defendants invoke a case about signs placed in a public road and right of way to argue for a right to ban signs in all land owned by the government. *See Grand Chute*, 915 F.3d 1120. In other words, Carbondale's Ordinance is simply not the ordinance at issue in *Grand Chute*, "a nondiscriminatory ban of all private signs from the public roads and rights-of-way." *Id.* at 1123 (citation omitted). An ordinance banning signs on any and all land owned by the public is fundamentally different. Applying *Grand Chute* to all public land would be as incongruous as applying it to signs on private property.

Second, this is an as-applied analysis. Defendants' interpretation of their Ordinance, which remains unclear, seemingly prohibits even a small sign placed in the center of a grassy field—or anywhere on public property—despite the sign being neither in a median, nor obstructing drivers' sight lines, nor permanently affixed to the ground. Under a narrow tailoring analysis, "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. As the Supreme Court has emphasized,

14

"A complete ban can be narrowly tailored but only if **each** activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz,* 487 U.S. 474, 485 (1988) (emphasis added). The City's interest in preventing obstruction does not align with Hamman's unobtrusive signs.

Moreover, the Ordinance does not leave open ample alternatives for communication. The Ordinance's enforcement prohibits all passive sign placement, regardless of size, distance, or obstruction on any public land whatsoever, effectively requiring speakers to physically bear the burden of their message at all times. That is not an "ample alternative" as required by *Perry*; it is no alternative at all. This interpretation fails to distinguish between potentially obstructive signs and Hamman's small signs over twenty feet from the nearest sidewalk. In *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994), the Supreme Court held that an ordinance that prohibited signs placed into the ground did not leave open ample alternative means of communication; the Court was "not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off." *Id.* Forcing persons to hold signs for extended periods of time to make their message heard is distinctly different than allowing signs temporarily placed in the ground. It also discriminates against those speakers who lack, or have a diminished capacity for, the physical ability to hold signs. The elderly, disabled, or those who wish to engage in a protest longer than their arms can literally bear are unable to find an alternative mode of communication under this Ordinance. As the Supreme Court highlighted, a "yard or window sign may have no practical substitute." *Id.* at 57. Moreover, the City refused to allow Hamman to even apply for a permit for a sign, categorically denying him that alternative.

Hamman was not blocking roads, obstructing drivers, or creating hazards—he was simply exercising the most basic of constitutional rights in a traditional forum. Yet the City's interpretation of its Ordinance would ban his speech entirely on any public land, offering no meaningful

15

alternatives and drawing no distinctions based on actual harm. This is precisely the kind of regulatory overreach the narrow tailoring requirement forbids.

### c) **The City has failed to prove that it has not engaged in viewpoint discrimination.**

Viewpoint discrimination is incompatible with the First Amendment. Government regulation of speech is impermissible when it is "an effort to suppress expression merely because public officials oppose the speaker's view." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). This "[d]iscrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 828–29. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Id.* at 828 (citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96 (1972)).

Defendants have engaged in viewpoint discrimination in their enforcement of Carbondale Ordinance § 15.4.10.8, applying it uniquely and aggressively towards religious speakers because of the viewpoint of their speech. Compl. ¶¶ 90, 91, 111, 113. The City's changing justifications for suppressing Hamman's speech—first commercial, then distance, then sign construction—are strong evidence of impermissible viewpoint discrimination. Selective enforcement based on viewpoint is evidenced by Defendants' shifting justifications: the City's first reasoning was that the signs were not demonstrative. Hamman Decl. ¶¶ 12-14. Then the City represented that the signs were merely not allowed on the "easement" near the street. *Id.* ¶¶ 23-26. Only then did the City adopt the view that signs were completely prohibited on public property. *Id.* ¶ 27. Defendants themselves fluctuated repeatedly in their understanding of the scope and effects of the Ordinance. As the Seventh Circuit observed in *Hitchcock v. Angel Corps, Inc.*, "shifting explanations" can

establish the "reasonable inference that they do not reflect the real reason" for an action. 718 F.3d 733, 738 (7th Cir. 2013). In other words, these shifting reasons demonstrate Defendants' viewpoint discrimination. *See also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000).

Moreover, in Hamman's video of these events, Defendants' discrimination is directly evidenced by a sign in the ground near the road for the restaurant Freddy's, similarly situated and comparable in size and shape to Hamman's signs, that was ignored entirely by Defendants until Hamman raised the issue. *See* Doc. 8-3, Hamman's April 16, 2025, Video, at 00:05:06.

Defendants also demonstrated viewpoint discrimination by denying Hamman a permit for his non-profit organization. On April 16, 2025, the police officers told Hamman's pastor that to have a sign "anywhere on city property. . . . you have to have a permit or authorization," and to go to city hall to seek that authorization. Def. Pre. Inj. Ex. 4 (Time Stamp 12:06:57-07:04). When the pastor pointed out that the message of the signs would not be acceptable because of their viewpoint, the police officer ***agreed***: "They would not condone this because ideologically I would guess they would not want these here. But you could say something that was completely different and I am sure . . ." *Id.* (Time Stamp 12:07:15-07:27). This explicit acknowledgement of viewpoint discrimination was then confirmed. Although § 15.4.10.8(A)(5)(b) expressly allows permits for non-profit organizations, Defendant Lenzini refused to issue one to Hamman. Hamman Decl. ¶ 34. Opportunities afforded to others were denied to him because of his religious pro-life viewpoint.

Defendants themselves have submitted further evidence of their own viewpoint discrimination. Submitted texts of Defendant Jamie Snyder, Def. Pre. Inj. Ex. 8 at 6, show Mr. Snyder specifically asking Defendant Lenzini about Hamman's viewpoint, asking if it was "coalitionnlife," a reference to a pro-life organization. Moreover, in the body camera footage of Sergeant Murray, Def. Pre. Inj. Ex. 2 (Time Stamp 11:47:23-43), Snyder again asks the same

17

question, with the officer responding that he doesn't know the official organization. Sergeant Murray also acknowledged the discrimination explicitly at another time: "I am sure it is viewpoint discrimination. . . . But if you are allowing some signs and not others, I am sure. If I was in charge of it I would say no political signs whatsoever, that way you cannot say, ok I allowed these people and didn't allow these people." *Id.* (Time Stamp 12:07:49-08:05).

Moreover, Hamman's affidavit includes several pictures he has taken of small temporary signs on public property all over the City of Carbondale. Hamman Decl. ¶¶ 40-43. For a variety of other forms of speech, Defendants do not enforce the Ordinance at all. But in the case of Hamman's pro-life religious speech, they have engaged in a targeted campaign of enforcement. Such a campaign of viewpoint discrimination is anathema to the First Amendment.

The sole question presented to this Court at this stage, as discussed above, is whether the City can show there to be no genuine dispute of fact over whether it has a discriminatory policy. Defendants do not rely on a legal argument or cases, but on factual assertions from Lenzini's Declaration. Lenzini has not been deposed nor his testimony tested through the adversarial process. At this stage, the evidence of the nonmovant is to be believed instead, *Anderson*, 477 U.S. at 255, and the evidence Hamman has presented of viewpoint discrimination properly credited.

Defendants rely extensively on *Grand Chute*, where a town official testified to the number of signs he pulled from public rights of way and verified that the signs were "safety hazards" because of the potential to block or interfere with traffic. *Constr. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute*, 297 F. Supp. 3d 850, 863 (E.D. Wis. 2018). But as discussed above, the parties conducted extensive discovery before the case was resolved on summary judgment. *Grand Chute*, 915 F.3d at 1122. Defendants here ask the Court to bypass all discovery and trust their factual assertions.

The evidence demonstrates a clear pattern of viewpoint discrimination by Defendants in violation of the First Amendment. Through shifting justifications for suppressing Hamman's religious pro-life speech, the City has revealed the true motivation: hostility toward the message. This discrimination is further evidenced by the selective enforcement against Hamman's signs while ignoring similarly situated signage from other speakers, the categorical refusal to issue permits despite express allowances for 501(c)(3) organizations, and Defendants' own admissions on body camera footage of the viewpoint-based nature of their enforcement.

### III.    The City has failed to prove that there is no material dispute over Hamman's Illinois RFRA claim (Count VII).

The Illinois Religious Freedom Restoration Act ("IRFRA") prohibits the government from substantially burdening a person's exercise of religion unless the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 775 ILCS 35/15. Defendants' enforcement actions directly burden Hamman's sincere religious exercise.

Defendants have substantially burdened religious practice by limiting Hamman's ability to carry signs that are part of the basic expression of his religious message. As discussed above, being prohibited from placing his signs on the ground constitutes a significant burden on his religious expression; he is unable to simultaneously carry the signs he needs to use to express his message and conduct his religious activity. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724–25 (2014), the Supreme Court emphasized that "federal courts have no business addressing" whether particular beliefs are "insubstantial" and that courts should not "presume to determine . . . the plausibility of a religious claim."

Defendants claim that speech is not chilled by being prohibited from placing signs in the ground. But the medium is the message. The Supreme Court has emphasized that speech is

burdened by not being allowed to place signs in the ground: even when analyzing real estate signs, the "options to which sellers realistically are relegated . . . involve more cost and less autonomy than 'For Sale' signs; are less likely to reach persons not deliberately seeking sales information, and may be less effective media for communicating the message that is conveyed by a 'For Sale' sign in front of the house to be sold, The alternatives, then, are far from satisfactory." *Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 93 (1977) (internal citations omitted).

The restriction forces Hamman to choose between core elements of his religious practice. His inability to use temporary signs has significantly hindered his ability to effectively communicate his pro-life message, as the signs allow him to reach a broader audience, including those in passing vehicles who might not otherwise stop. Hamman Decl. ¶ 45. Moreover, handheld signs would create safety concerns as he tries to both engage people in his religious conversation and hold the signs conveying his message. Hamman Decl. ¶ 46.

Hamman cannot simultaneously hold multiple signs necessary to convey his complete religious message, offer literature and materials to individuals, engage in prayer and counseling, and maintain the continuous presence his faith requires.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Hamman respectfully requests that this Court deny the City of Carbondale's Motion for Summary Judgment and grant such other relief as the Court deems just and proper.

Submitted: August 11, 2025

Respectfully submitted,


**_s/ Nathan J. Moelker_**
Nathan J. Moelker
Christina A. Compagnone
Liam R. Harrell
Kelsey E. McGee
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: kmcgee@aclj.org

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of August 2025, a true and correct copy of the above and foregoing document was filed electronically with the Clerk of the Court and was served upon all counsel of record via PACER.

<u>*/s/ Nathan J. Moelker*</u>
Nathan J. Moelker
*Counsel for Plaintiff*