## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK BRANDON HAMMAN,<br><br>*Plaintiff,*<br><br>*v.*<br><br>The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LENOARD JAMIE SNYDER, in his individual and official capacities,<br><br>*Defendants.* | Case No. 3:25-cv-00736-NJR<br><br>**Chief Judge Nancy J. Rosenstengel** |

## PLAINTIFF'S NOTICE OF INTERLOCUTORY APPEAL

Notice is hereby given that the Plaintiff in the above-captioned action, Mark Brandon Hamman, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the memorandum and order of the district court denying Plaintiff's motion for a preliminary injunction and entered in this action on January 21, 2026, at docket entry 49. *See* 28 U.S.C. § 1292(a)(1).

Submitted: January 23, 2026

Respectfully submitted,
*s/ Nathan J. Moelker*
Nathan J. Moelker
Kelsey E. McGee
Christina A. Compagnone
Liam R. Harrell
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, a true and correct copy of the above and foregoing document was filed electronically with the Clerk of the Court and was served upon all counsel of record via PACER.

*s/ Nathan J. Moelker*
Nathan J. Moelker
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

MARK BRANDON HAMMAN,

*Plaintiff,*

v.

The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LENOARD JAMIE SNYDER, in his individual and official capacities,

*Defendants.*

Case No. 3:25-cv-00736-NJR

**Chief Judge Nancy J. Rosenstengel**

---

**PLAINTIFF'S APPEAL DOCKETING STATEMENT**

Plaintiff-Appellant submits the following docketing statement pursuant to 7th Cir. R. 3(c)(1), for the purposes of his interlocutory appeal to the United States Court of Appeals for the Seventh Circuit from the district court's order of January 21, 2026, denying his motion for a preliminary injunction (Doc. 49):

1.     Jurisdiction of the District Court.

The district court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because it is a civil action against a municipal corporation and its officials based on claims arising under the Constitution and the laws of the United States, and it seeks equitable or other relief under an Act of Congress.  Venue is appropriate in the United States District Court for the Southern District of Illinois, pursuant to 28 U.S.C. §1391(b), because Defendants-Appellees reside in that district and division and/or all the acts described in the Complaint occurred within that district. Plaintiff-Appellant Brandon Hamman is a citizen of Illinois.

2.     Jurisdiction of the Court of Appeals.

The court of appeals has jurisdiction over this appeal since the interlocutory order of the

district court, from which this appeal is taken, is one refusing to issue a preliminary injunction. According to 28 U.S.C. § 1292(a)(1), "the courts of appeals shall have jurisdiction of appeals from (1) Interlocutory orders of the district courts of the United States . . . or of the judges thereof, . . . refusing . . . injunctions. . . ."

This appeal has been timely filed. The district court entered its order denying Plaintiff-Appellant's motion for a preliminary injunction on Wednesday, January 21, 2026, and Plaintiff-Appellant filed his notice of appeal from that order on Friday, January 23, 2026.

The district court's order denying Plaintiff-Appellant's motion for a preliminary injunction deals with the following claims raised in Plaintiff-Appellant's complaint: First Amendment Right to Free Speech based on the Ordinance (Count I); as-applied violations of his First Amendment Right to Free Speech based on Defendants' conduct (Counts II and III); and violation of his Due Process rights under the Fourteenth Amendment (Count V). Although three claims remain pending in the district court based on the Free Exercise Clause, the Equal Protection Clause, and the Illinois Religious Freedom Restoration Act, the district court's order denying Plaintiff-Appellant's motion for preliminary injunction on Counts I through III and V is immediately appealable by Plaintiff-Appellant pursuant to 28 U.S.C. § 1292(a)(1).

3.    Prior or Related Proceedings.

There have been no prior or related appellate court proceedings in this case, and as this is a civil case, and not a criminal case, there has been no prior litigation in the district court arising from any criminal conviction and there has been no designation by the district court that this or a related case satisfies the criteria of 28 U.S.C. § 1915(g).

4.    Parties to the Litigation Appearing in an Official Capacity.

The following Defendants-Appellees appear in this litigation in their official capacities:

John Lenzini, in his official capacity as the Community Development Manager of the City of Carbondale, and Lenoard Jamie Snyder, in his official capacity as the City Attorney of the City of Carbondale.

Submitted: January 23, 2026

      Respectfully submitted,

*__s/ Nathan J. Moelker__*
Nathan J. Moelker
Kelsey E. McGee
Christina A. Compagnone
Liam R. Harrell
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, a true and correct copy of the above and foregoing document was filed electronically with the Clerk of the Court and was served upon all counsel of record via PACER.

*s/ Nathan J. Moelker*
Nathan J. Moelker
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK BRANDON HAMMAN,

      Plaintiff,

v.                                                           Case No. 3:25-CV-00736-NJR

CITY OF CARBONDALE, ILLINOIS,
LEONARD J. SNYDER, and
JOHN LENZINI,

      Defendants.

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This case is about yard signs. Plaintiff Mark Brandon Hamman claims that the City of Carbondale ("Carbondale" or the "City") and two of its officials, City Attorney Leonard J. Snyder and Community Development Manager John Lenzini, violated his rights under the First and Fourteenth Amendments and under the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15, when they prohibited him from placing yard signs containing anti-abortion messages in the ground on a public right of way pursuant to Carbondale City Ordinance § 15.4.10.8 (the "Ordinance").[1]

Hamman filed a motion for a preliminary injunction to enjoin enforcement of the Ordinance. (Doc. 8). The Court held a two-day evidentiary hearing in August 2025 where Hamman, Lenzini, Snyder, and other witnesses testified. The motion is premised on

---

[1] Hamman advances seven claims for relief in this action: violation of his First Amendment Right to Free Speech based on the Ordinance (Count I); as-applied violations of his First Amendment Right to Free Speech based on Defendants' conduct (Counts II and III), violation of his First Amendment Right to Free Exercise of Religion (Count IV); violation of his Due Process rights under the Fourteenth Amendment (Count V); violation of his Right to Equal Protection under the Fourteenth Amendment (Count VI), and violation of the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15 (Count VII). (Doc. 1 (Compl.)).

Defendants' alleged violations of Hamman's First Amendment right to free speech. The
Court thus confines itself to that issue in addressing Hamman's request for injunctive relief.

BACKGROUND

A.  The Ordinance

The Ordinance regulates the placement of temporary signs within Carbondale as part
of an effort to address the risks posed by the "uncontrolled construction and use of signs."
City of Carbondale, Illinois, Code of Ordinances (hereinafter the "Code") § 15.4.10(2)(B). It
offers detailed guidance concerning the location, size, and number of temporary signs that
may be placed around the City. And it is part of a larger regulatory framework on signs that
seeks to promote "public safety on city streets by limiting the unnecessary distraction of the
motorist caused by signs," and to "protect the general public from damage and injury which
may be caused by the faulty and uncontrolled construction and use of signs within the city."
*Id.* § 15.4.10.2(A)-(B).

As relevant here, the Ordinance states that "[n]o sign may be erected on, suspended
over, or encroach upon the public right of way, except as provided for under section 17-1-5
of this code (dealing with "encroachments"), or be located so as to obstruct the visual
clearance needed for safe vehicle or pedestrian traffic." *Id.* § 15.4.10.8(A)(1) (the Court will
refer to this provision as the "general prohibition" on signs placed in the public right of way).
This general prohibition applies in all areas of Carbondale *other than* the BPR District (the
events giving rise to this action took place outside of the BPR District).[2] Section 17-1-5(A)(1)
of the Code defines a "public right of way" as a "public highway, street, sidewalk, alley, or

---

[2] The acronym BPR, somewhat counterintuitively, stands for "Primary Business." (Doc. 47, Aug. 11, 2025 Evid.
Hr'g Tr., p. 69).

publicly owned common area."[3] Temporary signs that are *not* subject to the general prohibition—*i.e.*, signs not in the public right of way—may not be "erected within twenty feet (20′) of the curb line of any adjoining street surface except those located in the BPR district in which case the temporary sign shall be flush mounted to the building." *Id.* § 15.4.10.8(A)(3).

Section 17-1-5 modifies the general prohibition by providing a permitting process for "encroachments" on the public right of way. *Id.* § 17-1-5. There are four types of "encroachment permits:" (1) continuous encroachment permits for encroachments that are "not readily movable" and may be "permanent" or "quasi-permanent;" (2) temporary encroachment permits for encroachments that may be "readily moved" and are intended to be placed on the public right of way for less than one year; (3) sidewalk restaurant encroachment permits; and (4) residential block party permits. *Id.* § 17-1-5(A)(1). According to Snyder, encroachment permits under section 17-1-5 seek to accommodate "specific" events and activities such as "street parties, sidewalk restaurants, and temporary sidewalk sales." (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 86). Encroachment permits, moreover, are *not*

---

[3] The Code also provides at least two other definitions of a "right of way" (without specifying its "public" character). First, under section 15.11.4, a "right of way" is "[a]n area dedicated or purchased by the city for the purpose of providing both vehicular and pedestrian travelways." Second, under section 17-12-2 a "right of way" is defined in more detail as:

> Any street, alley, other land or waterway, dedicated or commonly used for pedestrian or vehicular traffic or other similar purposes, including utility easements, in which the city of Carbondale has the right and authority to authorize, regulate or permit the location of facilities other than those of the city of Carbondale. "Right of way" or "rights of way" shall not include any real or personal city of Carbondale property that is not specifically described in the previous two (2) sentences and shall not include city of Carbondale buildings, fixtures and other structures or improvements, regardless of whether they are situated in the right of way.

Assuming, without deciding, that there is no meaningful difference between a "public right of way" and a "right of way" under the Code, these varying definitions do not appear to conflict with one another—at least not insofar as the issues in this case are concerned. Nor is the "symmetrical construction" of identical statutory terms always essential. *United States v. Cleveland Indians Baseball, Co.*, 532 U.S. 200, 213 (2001). "Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, the presumption is not rigid, and the meaning of the same words well may vary to meet the purposes of the law." *Id.* (citation modified); *see also Env't Defense v. Duke Energy Corp.*, 549 U.S. 561, 575-76 (2007) ("There is . . . no effectively irrebuttable presumption that the same defined term in different provisions of the same statute must be interpreted identically.").

available for the placement of temporary signs on the public right of way. (*Id.*).

The City interprets the Ordinance as a blanket prohibition on *all* temporary signs on
or within the public right of way. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 84). Snyder also
testified that the City has "always" interpreted the Ordinance this way and enforced it as a
general ban, subject to the exceptions in section 17-1-5. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr.,
p. 89).

But the Ordinance does not ban all temporary signs, at all times, and in all places.
Outside of the BPR District, the Ordinance accommodates "temporary noncommercial signs"
belonging to 501(c)(3) nonprofit organizations by creating a permitting process for their
"display." Code § 15.4.10.8(A)(5)(b)(2). Each nonprofit organization, it states in relevant part,
"will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive
days. Each organization is allowed a total of sixty (60) calendar days to display temporary
signs. A new permit shall be issued each time the temporary sign is to be displayed. Permit
fees may be waived with the approval of the administrative official."[4] *Id.*

Finally, the Ordinance prohibits *commercial* signs from being "carried, waved or
otherwise displayed by persons either on public rights of way or in a manner visible from
public rights of way." *Id.* § 15.4.10.8(A)(5)(a)(4). This restriction applies to "displays intended
to draw attention for a commercial purpose." *Id.* It "is *not* intended to limit the display of
banners, flags or other signage by persons participating in demonstrations, political rallies,
and similar events." *Id.* (emphasis added).

---

[4] A similar permitting process is available for signs in the BPR District. *See* Code § 15.4.10.7(K)(2)(b).

B.  Enforcement of the Ordinance against Hamman

1.  *Mark Hamman's Testimony*

Hamman describes himself as a "pro-life advocate" working as a local missionary in Carbondale. (Doc. 8 (Pl. Mot. for Prel. Inj., p. 1)). He is employed by Christ Church of Carbondale ("CCC"), operating through a non-profit ministry he founded called "Gospel for Life." (*Id.*, p. 1-2; Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 13, 31). Gospel for Life, as Hamman describes it, seeks to "glorify God through the proclamation of gospel and to rescue babies." (*Id.*, p. 14). To that end, Hamman's "primary mission" is to go to abortion facilities in Carbondale to try to persuade people not to get an abortion. (*Id.*, p. 14-15). He does so by placing signs in the ground containing anti-abortion messages and speaking with people. (*Id.*).

Hamman's signs are important to his work. They contain various messages opposing and discouraging abortion, such as "Babies are Murdered Here" and "Love your Preborn Neighbor as Yourself." (*Id.*, p. 15). Hamman uses these and other signs for two main reasons: first, if he is speaking with someone, they convey his message to others who are not part of the conversation; second, they "raise awareness" about "what's going on inside those [abortion] facilities. (*Id.*, p. 16). As he explains it, "I can't be everywhere all at one time and speaking to everybody, and so really to make sure that the message gets out there, that people know what's going on, and it helps me to reach those people that I wouldn't necessarily be able to if they're just driving by." (*Id.*, p. 24).

On April 16, 2025, Hamman went to the CHOICES Center for Reproductive Health ("CHOICES") on Giant City Road in Carbondale to "perform[] [his] mission, sharing the gospel, and [to] try[] to help families keep their baby." (*Id.*, p. 16; Def. Hr'g Ex. 1). He was

with two individuals identified as "Bob" and "Darlene," who often work with him, but are not part of Gospel for Life. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 16-17). Bob and Darlene placed their own signs in the ground, including one advertising "Free Baby Supplies."[5] Hamman did not place any signs in the ground initially. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 11).

At around 11:30 a.m., Lenzini showed up and demanded that Hamman, Bob, and Darlene remove the signs that had been placed in the ground.[6] (*Id.*, p. 18; Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 20-21). Lenzini told them that the sign advertising "Free Baby Supplies" was "not [a] demonstration [sign]." (*Id.*, p. 21). Aside from this observation, however, Hamman testified that Lenzini offered no reason why the signs had to be removed. (*Id.*, p. 22). Lenzini, on the other hand, testified that he told Hamman, Bob, and Darlene that their signs "could not be out there because they were on the right-of-way." (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 20). Lenzini also testified that his comment about the "free baby supplies" sign not being a demonstration sign was "in response to something they said," and not a separate reason why the Ordinance prohibited it from being placed in the public right of way. (*Id.*). According to a transcript of Lenzini's interaction with Hamman, Lenzini indeed told Hamman that the signs had to be removed because "[t]hey're on the city right-of-away [sic]" *before* discussing the sign advertising free baby supplies. (Def. Hr'g Ex. 19, p. 3). Their discussion about the demonstrative nature of the "free baby supplies" sign only took place

---

[5] The Court infers that these signs belonged to Bob and Darlene because Hamman testified that they "were not [his] signs," and that Bob or Darlene "had placed those signs in the ground." (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 21, 45).

[6] It is not entirely clear how many signs had been placed in the ground when Lenzini showed up. According to Hamman's body camera footage of the events on April 16, 2025, it appears approximately eight signs had been placed in the ground near the street curb where Hamman, Bob, and Darlene were protesting. (Pl. Hr'g Ex. 1, Time Stamp: 10:02:00-20).

after Hamman cited the Ordinance's provision on commercial signs, which is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." (*Id.*, p. 4-5 (discussing Code § 15.4.10.8(A)(5)(a)(4)). At that point, Lenzini told Hamman "Free baby supplies is not a demonstration." (*Id.*, p. 5).

At some point after Lenzini arrived, Hamman placed his own signs in the ground conveying the messages: "Babies Are Murdered Here," "We Will Adopt Your Baby," "Love Your Preborn Neighbor as Yourself," and "Don't Kill Your Baby, abortionpillreversal.com." (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 22). Lenzini threatened to call the police if Hamman did not remove his signs within five minutes. (*Id.*, p. 20). But Hamman, believing that the Ordinance permitted him to place his signs in the ground, told him that he should call the police right away to sort the issue out. (*Id.*).

During Lenzini's conversation with Hamman and a Pastor Jared Sparks, an "elder" of CCC who had also joined Hamman at CHOICES, Hamman began speaking with a woman who was passing by. (*Id.*, p. 51-52). Hamman told her: "[I]f you took the pill today, I want you to know about abortionpillreversal.com. We'd love to help you. There's still a chance for your baby to live today. Please let us help you. Come talk with us. We'd love to pray with you and find a solution that's not taking the life of your innocent child." (Def. Hr'g Ex. 19, p. 32). Hamman then engaged with a second woman and gave her a "gospel track" after a brief conversation. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 53-54). Neither Lenzini nor anyone else from the City attempted to stop or interfere as Hamman spoke with these women. (*Id.*, p. 54-55). Nor did any City official, including Lenzini, comment on the messages that Hamman's signs conveyed. (*Id.*, p. 55).

The police eventually showed up and told Hamman that his signs could be placed in the ground but only if they were located 20 feet or more from the curb. (*Id.*, p. 23). Hamman complied with this instruction and moved his signs back from the curb. (*Id.*). Lenzini, however, insisted that the Ordinance prohibited Hamman, Bob, and Darlene from placing *all* signs in the ground, regardless of their distance from the curb. (*Id.*, p. 24, 46).

Darlene eventually removed her signs from the ground and began "carrying" and "wearing" them, while continuing to protest abortion. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 47). Bob and Darlene experienced no further interference from Lenzini and other City officials after removing their signs from the ground and they continued their protest "unabated." (*Id.*, p. 47-48). Hamman, for his part, agreed to remove his signs after being told that he would be cited and his signs confiscated if he did not. (*Id.*, p. 24). After he did so, no citation was issued. (*Id.*, p. 49).

Lenzini told Hamman that he was free to do his work holding his signs, rather than placing them in the ground. (*Id.*, p. 48). Indeed, prior to April 16, 2025, Hamman had done exactly that as part of his work at times. (*Id.*). But it had become his preference to put his signs in the ground and, on that day, that was what he wanted to do. (*Id.*, p. 49). Nevertheless, after Hamman removed his signs from the ground, Pastor Sparks and a person identified as "Pastor Andy," another "elder" of CCC, carried the signs to spread their messages. (*Id.*, p. 50-51). As they did so, no one from the City interfered with them. (*Id.*, p. 51).

Hamman justifies his refusal to carry signs, in part, on the basis of traffic safety. As a former law enforcement officer, he believes that carrying signs creates a more significant traffic safety risk than staking them in the ground. (*Id.*, 24). In his words: "If you are ever out on the sidewalk in Carbondale, it can be pretty windy. So[,] I have seen signs that have been

blown across the street, they blow into traffic. I don't want my signs hitting somebody or something if I am talking to somebody up close or talking to somebody in their vehicle. I don't want that to happen. Again, I don't want it to blow into the road or cause an accident." (*Id.*, p. 67).

The following day, April 17, 2025, Hamman went to Carbondale City Hall to get a permit to place his signs in the ground near CHOICES and other abortion clinics in the City. (*Id.*, p. 27-28, 60). As a representative of CCC, which he understood was a 501(c)(3) nonprofit organization,[7] Hamman believed he could obtain a permit under section 15.4.10.8(A)(5)(b)(2) to place his signs in the ground at these locations. (*Id.*, p. 28, 65). At City Hall, he encountered Lenzini again. (*Id.*, p. 27-28). Lenzini told him that "there was no exception" to the ban on temporary signs in the public right of way, so Hamman left without a permit. (*Id.*, p. 28).

Hamman believes he was targeted by the City due to his message opposing abortion. He testified that, within a few days of April 16, 2025, he saw and photographed other temporary signs that were placed in the ground at "various locations" throughout Carbondale, including some that were "not even a block away" from CHOICES. (*Id.*, p. 25-27; Pl. Hr'g Ex. 2 (five photos of three different signs)). These signs shared messages unrelated to abortion. (*Id.*). Hamman admitted, however, that he did not know how long those signs had been in place when he photographed them. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 56).

### 2. *Leonard J. Snyder's Testimony*

Snyder is the City Attorney for Carbondale. (*Id.*, p. 83). He testified that because CHOICES is not within the BPR District, "[n]o signs are permitted to be erected in the right-

---

[7] CCC, according to testimony from Pastor Sparks, is a registered nonprofit organization "through the state of Illinois." (*Id.*, p. 76-77). It is unclear whether it is a federally recognized 501(c)(3) nonprofit. (*Id.*).

of-way." (*Id.*, p. 85). And while the Ordinance offers a permitting process for 501(c)(3) organizations to erect signs for certain periods of time, Snyder explained that a permit only allows such signs to be placed on *private* property. (*Id.*, p. 89). This is so because even a permitted sign must comply with the general prohibition under section 15.4.10.8(A)(1), which prohibits *all* signs in the public right of way. (*Id.*, p. 89-90). This has "always" been the City's interpretation of the Ordinance. (*Id.*, p. 89). And on April 16, 2025, Snyder provided guidance to Lenzini and officers of the Carbondale Police Department, consistent with this interpretation. (*Id.*, p. 93-94).

### 3.  *John Lenzini's Testimony*

As Carbondale's Community Development Manager, Lenzini manages the City's Planning and Zoning Division and its Code Enforcement Division. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 6). Lenzini's job in the Code Enforcement Division includes the removal of signs that are improperly placed in the public right of way. (*Id.*, p. 6-7). He does so "pretty much daily," without regard for the content of the message conveyed by a non-compliant sign. (*Id.*, p. 7). Lenzini estimates that, over the course of a year, the Code Enforcement Division removes between 150 and 200 signs, with spikes in the volume of non-compliant signs during political campaign seasons. (*Id.*, p. 9). Indeed, Lenzini testified that during political campaigns, he and his team preemptively communicate with political parties to ensure compliance with the Ordinance. (*Id.*). But, despite these efforts, the Code Enforcement Division "pull[s] a lot of political signs during campaign seasons." (*Id.*). Lenzini conceded, however, that delays in sign removal can happen—for instance when a sign is placed in the public right of way over the weekend. (*Id.*, p. 8). Non-compliant signs therefore may remain in place for "a couple of days." (*Id.*, p. 7-8).

On April 16, 2025, Lenzini went to the area around CHOICES and noticed signs placed in the public right of way. (*Id.*, p. 10). He determined that these signs were in violation of the Ordinance and asked the owners to remove them (Lenzini believes the owners were Bob and Darlene although they did not identify themselves). (*Id.*). Bob and Darlene removed their signs from the right of way with Lenzini's help and continued their protest by holding and carrying them instead. (*Id.*, p. 10-11). Neither Lenzini nor anyone else from the City interfered with Bob and Darlene's protest after they removed their signs. (*Id.*, p. 11).

While Lenzini spoke with Bob and Darlene, Hamman went to his car to retrieve his signs and placed them in the ground. (*Id.*, p. 11-12). Lenzini told Hamman that he had placed his signs in the public right of way, which covered an area from a fence around CHOICES to Giant City Road. (*Id.*, p. 12). Lenzini asked Hamman to remove his signs, but Hamman refused based on his understanding of his First Amendment rights. (*Id.*, p. 12-13). Like he had done with Bob and Darlene, Lenzini told Hamman that he could carry or wear his signs, but that they could not be in the ground of the public right of way. (*Id.*, p. 13). Hamman refused to remove his signs but moved them back from the curb several times in an attempt to get them out of the public right of way. (*Id.*). Lenzini told him, however, that he "was on the right of way the whole time," and that the signs had to be removed from the ground. (*Id.*).

Because Hamman refused to comply, Lenzini began writing up a citation. (*Id.*, p. 15). Lenzini asked officers of the Carbondale Police Department to help him complete the citation because Hamman refused to identify himself. (*Id.*). At this point, Hamman complied and removed his signs. (*Id.*, p. 16). Lenzini, in turn, did not issue a citation. (*Id.*).

The following day, April 17, 2025, Lenzini encountered Hamman at City Hall. (*Id.*). Their interaction was brief. Hamman told Lenzini that he wanted a permit to place his signs

in "various places," which Lenzini understood to include the area near CHOICES where Hamman wanted to place them the previous day. (*Id.*, p. 17). Hamman briefly mentioned the Ordinance's permitting process for 501(c)(3) nonprofit organizations, but did not identify the organization he purported to represent. (*Id.*). Although Hamman never submitted a permit application, Lenzini testified that, even if he had, the application would have been denied because the City is not allowed to issue permits for signs to be placed in the public right of way. (*Id.*).

Lenzini also introduced a "subdivision plat" to illustrate the location where Hamman had wanted to place his signs (reproduced in relevant part below):



(Def. Hr'g Ex. 17). The plat, on the right-hand side, identifies Giant City Road and offers distance markers of 100 feet and 120 feet to its left and right respectively. The area identified as "Giant City Road" includes the area for car traffic, sidewalks, and other areas even though they are not separately identified on the plat. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 46). The thick black line identifying the left edge of Giant City Road is a property line. (*Id.*, p. 43). The public right of way, Lenzini explained, extends all the way to the property line. (*Id.*, p. 43-44). CHOICES is located on Lot 14 of the plat, which borders the area identified as "Giant City Road." (*Id.*, p. 45-46). Immediately to the right of Lot 14's property line is a grassy area, where Hamman had placed his signs. (*Id.*, p. 48).

### 4. *Officer Samuel Tyner's Testimony*

Officer Samuel Tyner, a patrol officer for the City of Carbondale, was the first police officer to arrive at CHOICES on April 16, 2025. (*Id.*, p. 25-27). He told Hamman and Pastor Sparks that, although he did not know all the details of the Ordinance, "signs were not allowed to be placed on the City's right-of-way and we would like for them to just remove the signs." (*Id.*, p. 27). He also "explained to them they could carry the sign, hold the signs, they just couldn't be planted on the property." (*Id.*).

Although Officer Tyner offered these instructions, he admitted that his understanding of the Ordinance was limited. (*Id.*, p. 29). He also agreed, based on parts of the Ordinance that Hamman had shown him, that it was "poorly written" and that he was "confused" about what it required. (*Id.*, p. 30-31). So, to ensure he was offering accurate information, Officer Tyner asked his supervisor, Sergeant Mark Murray, to come to the scene to "make a final decision." (*Id.*, p. 29). Officer Tyner nevertheless remained in the area until Hamman removed his signs from the ground. (*Id.*, p. 27).

5. *Sergeant Mark Murray's Testimony*

Sergeant Murray has served as a Carbondale police officer for over 15 years. (*Id.*, p. 49). By his own admission, he also is not familiar with the Ordinance. (*Id.*, p. 52). Sergeant Murray thus contacted Snyder for guidance and "explained to [Hamman] what I had spoken to the City Attorney about, that he can't place any signs on the city right-of-way, and he believed that he could, and I explained to him that this is the interpretation of the attorney and that's what I would have to proceed with." (*Id.*, p. 51). Snyder had also told Sergeant Murray that Hamman and others were free to carry or wear their signs, which Sergeant Murray also conveyed to Hamman. (*Id.*, p. 52).

As he spoke with Pastor Sparks, Sergeant Murray told him that officials for the City "would not condone this because ideologically, I would guess they would not allow these here. But you could say something that was completely different, and I'm sure they would be all for it." (Pl. Hr'g Ex. 6, Time Stamp: 12:07:15-27). At the evidentiary hearing, Sergeant Murray expounded on this comment: "I think based on the City's priorities and past experience with them that if it's not—I guess to break it down in terms of right and left type things, if it's more of a right-wing belief it's discouraged." (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 56). Sergeant Murray admitted, however, that he was not aware of any instance in which the City removed a sign in the public right of way based on the message it conveyed. (*Id.*, p. 57). Indeed, in his experience, Carbondale officials "take everything out of there that's on the City's right-of-way." (*Id.*). He also conceded that his comment to Pastor Sparks about the City objecting to Hamman's message on ideological grounds was his "personal opinion." (*Id.*).

*6. Lieutenant Theodore Lattan's Testimony*

Lieutenant Theodore Lattan is a 15-year veteran of the Carbondale Police Department. (*Id.*, p. 59). On April 16, 2025, he was dispatched to CHOICES along with Sergeant Murray and Officer Tyner. (*Id.*, p. 60-61). On his way there, he spoke with Snyder who explained to him that "the only issue was that they [the signs] were planted into—erected on that right-of-way, and that they could be carried, held, or worn on that day." (*Id.*, p. 61). He explained this to Hamman. (*Id.*, p. 61-62). Hamman, in turn, asked Lieutenant Lattan to speak with his attorney. (*Id.*, p. 62). The attorney asked Lieutenant Lattan if he planned to take Hamman into custody, to which Lieutenant Lattan responded that there would be no need for that or a citation if Hamman voluntarily complied with the City's directive to remove his signs from the ground. (*Id.*).

Lieutenant Lattan also spoke separately with Sergeant Murray and told him that "this is a very grey and touchy area." (Pl. Hr'g Ex. 6, Time Stamp: 12:18:42-48). He was asked about this comment at the hearing and testified that it was meant to ensure he and his fellow officers exercised the proper restraint because they were dealing with Hamman's First Amendment rights. ([Doc. 48](), Aug. 13, 2025 Evid. Hr'g Tr., p. 66-67). Thus, as Lieutenant Lattan explained it, "knowing that when we were dealing with people who were engaged in public protests that, you know, I want to do everything I can to gain that voluntary compliance other than take some sort of enforcement action." (*Id.*, p. 67). Hamman, for his part, eventually removed his signs based on his attorney's advice. (*Id.*, p. 63).

Lieutenant Lattan, in his experience, has "never seen or been aware of our police department or the City removing signs based on their content other than when they were in violation of the city ordinance." (*Id.*).

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In First Amendment cases, however, the likelihood of success on the merits is usually the decisive factor." *Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). "That is because even short deprivations of First Amendment rights constitute irreparable harm, and 'the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.'" *Higher Soc. of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (quoting *Am. Civ. Lib. Union of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012)). Moreover, when the issue involves an alleged infringement on speech, the burden is on the government to demonstrate the constitutionality of its actions. *Barland*, 751 F.3d at 830.

## DISCUSSION

A.  Likelihood of Success on the Merits

Hamman attacks the Ordinance on several grounds. First, he contends that it is unconstitutionally vague because it fails to explain to people of ordinary intelligence how it is violated and encourages arbitrary and discriminatory enforcement. Second, he argues that the Ordinance impermissibly restricts speech in a public forum. And third, he argues that Defendants engaged in viewpoint discrimination against him based on the anti-abortion messages he sought to convey. The Court will address each of these arguments in turn.

### 1. *Vagueness*

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Hamman believes the Ordinance flunks both of these tests. The Court will examine it accordingly.

### a.   Notice to people of ordinary intelligence

"To survive a vagueness challenge, a . . . statute must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). In other words, "the indeterminacy of what conduct constitutes a violation makes a statute vague." *Brown*, 86 F.4th at 772.

Hamman fuses two lines of reasoning into his argument that the Ordinance fails to provide people of ordinary intelligence fair notice of what it prohibits. He begins by focusing on Lenzini's *statements*, arguing that vagueness is established by his varying explanations of what the Ordinance prohibited. Second, he argues that the Ordinance is a muddled mess on its face because it fails to define key terms and may (or may not) exempt 501(c)(3) nonprofit organizations, like CCC, from the general prohibition on signs being placed in the public right of way.

Hamman cites three allegedly inconsistent statements from Lenzini as evidence of the Ordinance's vagueness: (1) his indication that the sign advertising "Free Baby Supplies" was

not demonstrative in nature and thus not allowed to be placed in the ground; (2) his subsequent explanation that *no* signs could be placed in the ground on a public right of way; and (3) his indication on April 17, 2025, that no permits were available for signs to be placed in the ground outside of CHOICES, notwithstanding the Ordinance's permitting process for signs belonging to 501(c)(3) nonprofit organizations. In effect, Hamman contends that these statements show a City official broadening the scope of the Ordinance by individual fiat to ensure the removal of messages opposing abortion. A closer look at Lenzini's statements, however, shows that his instructions were consistent with the text of the Ordinance.

Shortly after Lenzini arrived outside of CHOICES, he told Hamman: "Free baby supplies is not a demonstration." Hamman understood this comment as Lenzini's first attempt to explain why he was prohibited from placing his signs in the ground. But this interpretation of Lenzini's comment is doubtful. The *first thing* Lenzini told Hamman after he arrived on the scene was that any signs in the ground, including the "free baby supplies" sign, had to be removed because "[t]hey're on the city right-of-away [sic]." Lenzini and Hamman's conversation about the demonstrative nature of the "free baby supplies" sign took place *after* Lenzini gave this explanation for his demand.

Lenzini testified that his comment about the "free baby supplies" sign was "in response to something they said." This explanation is plausible because it lines up with the recordings of Lenzini's interaction with Hamman. Indeed, *after* Lenzini told Hamman that the signs in the ground had to be removed, Hamman cited Code § 15.4.10.8(A)(5)(a)(4) to show that he was acting in compliance with the Ordinance. That section states in full:

> Commercial signs prohibited: Includes signs that are carried, waved or
> otherwise displayed by persons either on public rights of way or in a manner
> visible from public rights of way. This provision is directed toward such

displays intended to draw attention for a commercial purpose, and is *not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events.* (emphasis added).

Only after Hamman cited this provision of the Ordinance did Lenzini reply: "Free baby supplies is not a demonstration." So, while Lenzini may have disagreed with Hamman's claim that the "free baby supplies" sign was demonstrative under section 15.4.10.8(A)(5)(a)(4), the record does not show that his comment was offered as an independent justification for his demand that the signs be removed. The Court thus disagrees with Hamman that Lenzini's comment is evidence of a malleable justification for the need to remove signs from the public right of way.

Moreover, whether the "free baby supplies" sign was demonstrative or not had nothing to do with Hamman's right to place it in the ground. This is so because section 15.4.10.8(A)(5)(a)(4) prohibits commercial signs from being "carried, waved or otherwise displayed" on a public right of way, while exempting non-commercial signs. So even if the "free baby supplies" sign was demonstrative, as Hamman suggests, section 15.4.10.8(A)(5)(a)(4) would have only allowed him to carry, wave or otherwise display it, not place it in the ground. This limitation matters because nothing in section 15.4.10.8(A)(5)(a)(4) suggests that it modifies the general prohibition on signs "erected on, suspended over, or encroach[ing]" upon a public right of way. Instead, this provision appears to allow exactly what it says: carrying, waving or otherwise displaying noncommercial signs on a public right of way (as Lenzini and the Carbondale police repeatedly told Hamman he could). *See Leibundguth Storage & Van Serv., Inc. v. Village of Downers Grove, Ill.,* 939 F.3d 859, 861 (7th Cir. 2019) (rejecting a textual interpretation of local sign ordinance). Lenzini's comment about the "free baby supplies" sign thus was neither offered as a reason for the City's demand that

Hamman remove his signs from the ground, nor did it have anything to do with Hamman's right to place signs in the ground to begin with. And for those reasons, it does not support Hamman's claim that the Ordinance is unconstitutionally vague.

Lenzini's statements that *no* signs could be placed in the ground on the public right of way and that no permits were available that would have allowed Hamman to do so also do not show vagueness. The Ordinance's general prohibition states that "[n]o sign may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with "encroachments"), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic." Code § 15.4.10.8(A)(1). The City interprets this provision as a comprehensive ban on signs being placed in the ground on a public right of way. Indeed, this has "always" been its interpretation of the Ordinance. The only exception is for permitted "encroachments," which Snyder defined as "street parties, sidewalk restaurants, and temporary sidewalk sales." Lenzini's statements that no signs were permitted in the ground on a public right of way and that no permits existed to displace the general prohibition is thus consistent with the text of the Ordinance itself and the City's interpretation of it. *See Leibundguth*, 939 F.3d at 861-62 (deferring to village's "understanding of its own ordinance," absent evidence of discriminatory enforcement).

Hamman's argument that Lenzini offered varying explanations of the Ordinance's scope to censor messages opposing abortion does not stand up to scrutiny. Throughout his encounters with Hamman, Lenzini consistently enforced the Ordinance's general prohibition on signs placed in the public right of way. Thus, the Court disagrees with Hamman that Lenzini's statements support the Ordinance's vagueness. *Cf. Constr. & Gen. Lab. Union No.*

*330 v. Town of Grand Chute*, 915 F.3d 1120, 1124-26 (7th Cir. 2019) (local sign ordinance constitutional even though municipal officials did not interpret it consistently).

Hamman also faults the Ordinance for failing to define certain terms, including a "public right of way," and what it means for a sign to be "erected on, suspended over, or encroach upon the public right of way." This, he contends, shows its vagueness because it prevents people of ordinary intelligence from determining what is and is not permitted. Hamman's criticism is inapposite for several reasons. First, he cites no case supporting the contention that a failure to define these commonly understood terms renders a law unconstitutionally vague.[8] *Cf. United States v. Castillo*, 406 F.3d 806, 821 (7th Cir. 2005) (holding that commonly understood terms in jury instructions need not be separately defined). Second, the Ordinance does define a "public right of way." Recall that the general prohibition excepts permitted "encroachments" under section 17-1-5. That section, in turn, defines a "public right of way" as "any public highway, street, sidewalk, alley, or publicly owned common area." Code § 17-1-5(A)(1). Hamman is thus incorrect to assert that the Ordinance fails to define a public right of way altogether. Third, the concept of a right of way has a commonly understood meaning that does not demand exhaustive definition. *See McClanahan v. City of Tumwater*, No. 11–cv–5623, 2012 WL 4113383, at *5 (W.D. Wash. Sept. 19, 2012) (holding that term "right of way" has generally accepted meaning and rejecting vagueness challenge to local sign ordinance as a result).

Hamman's argument concerning the absence of clear definitions for "*erected on, suspended over, or encroach upon* the public right of way" fares no better. "Absent any statutory

---

[8] Hamman cites *Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023), in this part of his brief, but only to support the general proposition that people must be able to "know the ordinary meaning of the ordinance or to know what conduct may be prohibited." (Doc. 8 (Pl. Mot. for Prel. Inj., p. 9)).

definition, a term should be given its commonly understood meaning." *United States v. Cooper*, 19 F.3d 1154, 1165 (7th Cir. 1994). To "erect on," "suspend over," and "encroach upon," all have commonly understood meanings, especially in the context of the Ordinance. To "erect" something is to "to fix [it] in an upright position," or "to cause [it] to stand up or stand out." Webster's Collegiate Dictionary 554 (12th ed. 2026). To "suspend" something—as that term is used in the Ordinance—is "to hang so as to be free on all sides except at the point of support." *Id.* at 1587. And to "encroach" upon something is "to enter by gradual steps or by stealth into the possession or rights of another," or "to advance beyond the usual or proper limits." *Id.* at 539. These terms all work to convey a comprehensive prohibition on signs in or over the public right of way. The Ordinance is not unconstitutionally vague because it fails to explicitly define them. *See Hill*, 530 U.S. at 732 (holding that "protest," "education," "counseling," "consent," and "approaching" are not unconstitutionally vague because "[t]he likelihood that anyone would not understand any of those common words seems quite remote"); *Cooper*, 19 F.3d at 1165 (rejecting argument that 'working in furtherance of a continuing criminal enterprise' is unconstitutionally vague because 'in furtherance' has commonly understood meaning).

The Ordinance also states that "[n]o temporary sign shall be erected within twenty feet (20') of the curb line of any adjoining street surface except those located in the BPR district in which case the temporary sign shall be flush mounted to the building." Code § 15.4.10.8(A)(3). Here, too, Hamman tries to find vagueness where there is none. He reasons that because this provision allows signs to be placed 20 feet or further from a curb line, the City's enforcement of a total ban on signs on "public property" was inconsistent with something the Ordinance affirmatively permitted. The problem with his argument is that

nothing in section 15.4.10.8(A)(3) purports to modify the general prohibition, which applies to areas designated as a public right of way. Section 15.4.10.8(A)(3), on the other hand, applies all other areas where signs may be placed—*i.e.*, not in the public right of way. Hamman misunderstands the general prohibition on signs in the public right of way as one that extends to all public *property* in Carbondale. Nothing in the Ordinance supports such a broad reading of the general prohibition, nor did any City official testify that it is enforced that way.

Finally, Hamman claims that the Ordinance's permitting process for "temporary noncommercial signs" belonging to 501(c)(3) organizations confuses the public because it suggests that CCC (assuming it is a federally recognized 501(c)(3) nonprofit organization) should be allowed to get a permit to "display" temporary noncommercial signs. The relevant provision under section 15.4.10.8(A)(5)(b)(2) states that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days. Each organization is allowed a total of sixty (60) calendar days to display temporary signs. A new permit shall be issued each time the temporary sign is to be displayed."

Conspicuously absent from this section is any mention of how it relates to, or modifies, the general prohibition on temporary signs in the public right of way. And the same is true of the general prohibition itself—it does not mention the permitting process for 501(c)(3) organizations. Both sections appear entirely unrelated. This is telling because the general prohibition specifically exempts permitted "encroachments" under section 17-1-5 from its reach. If the City wanted to do the same with "temporary noncommercial signs" belonging to 501(c)(3) nonprofits, it could have said so in the general prohibition. The fact that it did not indicates to people of ordinary intelligence that even a permit for a temporary

noncommercial sign does not allow that sign to be placed in the public right of way. *See Leibundguth*, 939 F.3d at 861 (exemption of certain signs from permitting requirement under local ordinance did not mean other rules applicable to signs generally did not apply to those signs). So, a plain reading of the Ordinance demonstrates that no permit was available that would have allowed Hamman to place his signs in the public right of way. And for that reason, the permitting process under section 15.4.10.8(A)(5)(b)(2) does not render the Ordinance unconstitutionally vague. *See United States v. Walton*, 36 F.3d 32, 35 (7th Cir. 1994) (holding that statute that "explicitly and clearly forbids" certain conduct was not unconstitutionally vague).

To sum it up, neither Lenzini's statements about the Ordinance, nor the Ordinance itself suggest that its scope is unclear to people of ordinary intelligence. The Ordinance is thus not unconstitutionally vague for that reason.

### b.  Authorizing arbitrary or discriminatory enforcement

A law can also be unconstitutionally vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Simply stated, the First Amendment does not tolerate a law "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

On this point, Hamman again points to the permitting process for signs belonging to 501(c)(3) nonprofit organizations under section 15.4.10.8(A)(5)(b)(2) as evidence of unbridled discretion being vested in City officials. As he sees it, section 15.4.10.8(A)(5)(b)(2) is a

regulatory free-for-all that allows City officials to approve permits for signs they like and deny permits for ones they don't. This is so, he contends, because section 15.4.10.8(A)(5)(b)(2) lacks any objective criteria guiding a City official's evaluation of a permit application. As noted, section 15.4.10.8(A)(5)(b)(2) states in relevant part that "[e]ach individual 501(c) not for profit organization *will be allowed* to display a temporary sign" for certain periods of time and explains that "[a] new permit *shall be issued* each time the temporary sign is to be displayed" (emphases added).

The first problem with Hamman's argument is that the relevant language of the provision he cites gives City officials *no discretion* to deny temporary sign permits for qualifying "display[s]." So much is clear from the directive that qualifying nonprofit organizations "will be allowed" to display temporary signs and that permits "shall be issued" for compliant "display[s]" of temporary signs. *See Ward v. Rock Against Racism*, 491 U.S. 781, 794–95 (1989) ("By its own terms the city's sound-amplification guideline must be interpreted to forbid city officials purposely to select inadequate sound systems or to vary the sound quality or volume based on the message being delivered by performers."). So, while the First Amendment emphatically prohibits "unbridled" permitting discretion, this concern is not present here because section 15.4.10.8(A)(5)(b)(2) does not appear to grant City officials *any* discretion to permit compliant "display[s]" of temporary signs by 501(c)(3) organizations.

Hamman's argument also rests on the mistaken premise that a permit for a 501(c)(3) nonprofit organization disables the general prohibition on signs in the public right of way. If section 15.4.10.8(A)(5)(b)(2) operated this way, Hamman might have a compelling argument that the City's permitting discretion is too broad. But there is no indication that it works that way. The reason section 15.4.10.8(A)(5)(b)(2) provides no objective permitting standards for

signs to be placed in the public right of way is because the Ordinance prohibits *all* temporary signs from being placed in the public right of way. In other words, while permits "shall be issued" for "display[s]" of temporary noncommercial signs, a permit does not deactivate the general prohibition. "[T]he comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Hill*, 530 U.S. at 731.

The text of the Ordinance supports its complete ban on signs in the public right of way, as does the City's consistent historical interpretation of it. Witness after witness at the evidentiary hearing testified that Carbondale prohibits *all* sings in the public right of way. Lenzini removes signs around Carbondale for this very reason "pretty much daily." Thus, the permitting process for temporary noncommercial signs belonging to 501(c)(3) nonprofit organizations does not support Hamman's vagueness argument. *See Kissick v. Huebsch*, 956 F. Supp. 2d 981, 992-93 (W.D. Wis. 2013) (permitting rules that gave police no discretion to favor one permit application over another did not violate First Amendment).

For these reasons, the Court is satisfied that the Ordinance is not unconstitutionally vague.

### 2.  *Speech in a Public Forum*

Public forums are critical to First Amendment activity because "by long tradition or by government fiat [they] have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Public streets are "quintessential public forums" where "the rights of the state to limit expressive activity are sharply circumscribed." *Id.* Here, the City correctly recognizes that the area outside of CHOICES, where Hamman conducted his missionary work and wanted to place signs in the ground, is a public forum. It is a grassy area, owned by the City, that runs parallel to a public street and sidewalk. But

this does not leave the City powerless to regulate speech there. The government may restrict the time, place, and manner of speech in a public forum if the restriction is (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leaves open ample alternative channels of communication. *Ward*, 491 U.S. at 791.

Content neutrality turns on "whether the government has a adopted a regulation of speech because of disagreement with the message it conveys." *Id.* To be content-neutral, a law may not restrict speech "because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation marks omitted). Thus, if a regulation "applies to particular speech because of the topic discussed or the idea or message expressed," it is content based. *Id.*

The text of the Ordinance does not concern itself with content. It states that "*[n]o sign may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with "encroachments"), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic.*" Code § 15.4.10.8(A)(1) (emphasis added). This is a comprehensive ban of *all* signs in the public right of way. No exception is made for signs displaying a certain message. The Ordinance's general prohibition on signs in the public right of way is thus agnostic to content. *See Weinberg v. City of Chicago*, 310 F.3d 1029, 1037 (7th Cir. 2002).

Of course, the general prohibition on signs in the public right of way is not a ban on everything under the sun. The Ordinance exempts permitted "encroachments" under section 17-1-5 of the Code. And to that end, four types of encroachments may be permitted in a public right of way: (1) continuous encroachments that are "not readily movable" and may be "permanent" or "quasi-permanent;" (2) temporary encroachments that may be "readily

moved" and are intended to be placed in the public right of way for less than one year; (3) sidewalk restaurant encroachments; and (4) residential block party encroachments. *Id.* § 17-1-5(A)(1). A straightforward reading of these encroachment descriptions shows that they have little (if anything) to do with signs or their content. As Snyder explained, the encroachment exception accommodates "specific" events and activities such as "street parties, sidewalk restaurants, and temporary sidewalk sales." None of this suggests a content-based restriction. "Allowing some forms of expression while denying others does not signify a violation of the First Amendment." *Weinberg*, 310 F.3d at 1036. And a comprehensive restriction on a certain type of speech does not transform itself into a content-based one because it exempts a different form of expression. *Id.* The Ordinance is thus content neutral.

The next prong of the time, place, and manner analysis—whether the Ordinance is narrowly tailored to serve a significant government interest—is hotly contested. The Ordinance, in combination with other sign regulations in the Code, seeks to promote "public safety on city streets by limiting the unnecessary distraction of the motorist caused by signs," and to "protect the general public from damage and injury which may be caused by the faulty and uncontrolled construction and use of signs within the city." Code § 15.4.10.2(A)-(B). These regulatory goals reflect significant government interests. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981).

The more difficult question is whether the Ordinance is narrowly tailored to achieve these interests. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Under this standard, the government retains some flexibility as it is not required to choose "the least restrictive method" to achieve its goals.

*Weinberg*, 310 F.3d at 1040. And although there must be some evidence of the problem the government seeks to address, this requirement is "not overwhelming." *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999).

Here, evidence of how temporary signs create traffic hazards is sparse, but it does exist. Hamman himself acknowledges that his signs can pose a safety hazard. He testified about the risks posed by temporary signs in Carbondale in particular: "If you are ever out on the sidewalk in Carbondale, it can be pretty windy. So[,] I have seen signs that have been blown across the street, they blow into traffic. I don't want my signs hitting somebody or something if I am talking to somebody up close or talking to somebody in their vehicle. I don't want that to happen. Again, I don't want it to blow into the road or cause an accident." Hamman, of course, offered this testimony to support his preference to place signs in the ground, rather than carry them (he deemed this to be the safer alternative). But whatever the reason for Hamman's testimony on this point, it is evidence of a traffic risk created by temporary signs near a roadway—especially his experience "see[ing] signs that have been blown across the street, they blow into traffic."

The problem the Ordinance addresses also is one that exists as a matter of common sense. Of course, common sense *alone* is not enough to carry the government's burden of developing evidence of its need for a speech restriction. *Horina v. City of Granite City*, 538 F.3d 624, 633 (7th Cir. 2008). This is so because governmental justifications for speech restrictions based on common sense "can all-too-easily be used to mask unsupported conjecture." *Id.* But this does not mean that common sense has no role to play here. *Id.*; *see also Anderson v. Milwaukee Cnty.*, 433 F.3d 975, 978 (7th Cir. 2006) ("Common sense must not be and should not be suspended when judging the constitutionality of a rule or statute."). With these

cautionary principles in mind, it is apparent that the proliferation of temporary signs near vehicular roadways can distract drivers and lead to signs ending up in the street, as the Ordinance's purpose acknowledges. *See Adams Outdoor Advert. Ltd. P'Ship v. City of Madison*, 56 F.4th 1111, 1120 (7th Cir. 2023) (holding in time, place, and manner analysis that "the connection between billboards and traffic safety is too obvious to require empirical proof."); *Luce v. Town of Campbell*, 872 F.3d 512, 517 (7th Cir. 2017) (similar); *cf. Grand Chute*, 915 F.3d at 1126 (affirming district court's finding that local sign ordinance was narrowly tailored to meet stated goal: "the banning of anything on the public right-of-way that might obstruct vision or distract passing drivers."). So, Hamman's recognition of the risks his signs posed, especially in windy conditions, along with the City's commonsense judgments about these risks generally, is evidence of the City's need for the Ordinance. *See Metromedia*, 453 U.S. at 508-09 (deferring to "accumulated, common-sense judgments of local lawmakers" that billboards create traffic hazards notwithstanding "meager record" on this point).

The fact that the City chose to ban the placement of signs in the ground and not people carrying them is a matter of legislative judgment. Hamman questions this judgment because, as he sees it, there is no way his "small signs" obstruct traffic during the "very brief[]" periods when they are displayed. (Doc. 8 (Pl. Mot. for Prel. Inj., p. 13)). Thus, he contends that the Ordinance burdens far more speech than necessary. But "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. Here, the City decided to impose a wholesale ban on signs that are "erected on, suspended over, or encroach upon" the public right of way. It did not prohibit people from

carrying signs—as Bob, Darlene, Pastor Sparks, and Pastor Andy did after they were asked to remove theirs from the ground. The Ordinance thus burdens one form of speech, while leaving open another. And for that reason, it is narrowly tailored to reduce traffic hazards from signs in the right of way.

Hamman does not appear to contest the third element of the time, place, and manner analysis: the availability of alternative channels of communication. Lenzini, Officer Tyner, Sergeant Murray, Lieutenant Lattan, and even Hamman himself testified that there was no restriction on his ability to protest abortion while carrying signs. Indeed, of the five people who showed up outside of CHOICES to share messages opposing abortion on April 16, 2025, Hamman was the only one who chose *not* to do so—Bob, Darlene, Pastor Andy, and Pastor Sparks did, and they did so without interference from the City, as Hamman acknowledges. So, not only was an alternative mode of communication offered, several people made use of it on the spot. And while this alternative did not align with Hamman's preferred demonstration method, "[a]n adequate alternative does not have to be the speaker's first choice" to pass constitutional muster. *Weinberg*, 310 F.3d at 1041. Accordingly, the Ordinance left open ample alternative channels of communication. *See Peterson v. Village of Downers Grove*, 150 F. Supp. 3d 910, 923-24 (N.D. Ill. 2015) (local ordinance that prohibited *painted* wall signs but permitted other forms of signs left open ample alternative channels of communication), *aff'd sub nom.*, *Leibundguth Storage & Van Serv., Inc. v. Village of Downers Grove*, 939 F.3d 859 (7th Cir. 2019).

With that, the Court concludes that the Ordinance reflects a permissible time, place, and manner restriction on speech in a public forum consistent with the First Amendment.

3. *Viewpoint Discrimination*

Hamman's final argument advances a theory of viewpoint discrimination based on the City's "policy of inaction" towards signs that share messages other than his. (Doc. 8 (Pl. Mot. for Prel. Inj., p. 15)). He submitted photos of three temporary signs he found throughout Carbondale which, he believes, were placed in the public right of way and not removed the way his were. From there, he contends that the City engaged in a "targeted campaign of enforcement" against his signs based on their anti-abortion messages.

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector and Visitors of Univ. of Virginia.*, 515 U.S. 819, 828 (1995). A law that "reflects the Government's disapproval of a subset of messages it finds offensive" is "the essence of viewpoint discrimination." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (quotation marks omitted). Viewpoint discrimination, in turn, is "an egregious form of content discrimination" under the First Amendment. *Rosenberger*, 515 U.S. at 829. Accordingly, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

"[E]ven a neutral ordinance can violate the First Amendment if it is enforced selectively, permitting messages of which the Town approves while enforcing the ordinance against unions and other unpopular speakers." *Grand Chute*, 915 F.3d at 1123 (citation modified). So, "when someone challenges a law as viewpoint discriminatory but it is not clear from the face of the law which speakers will be allowed to speak, he must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). The question here is whether Defendants

enforced the Ordinance selectively to prohibit Hamman's message opposing abortion, while, at the same time, taking no action against speakers and signs sharing different messages.

Lenzini testified that he removes signs that do not comply with the Ordinance "pretty much daily." He estimates that he and his colleagues remove around 150 to 200 signs per year for that reason; not surprisingly, they are especially busy during political campaign seasons. And he insists that he has *never* removed a sign based on its content or viewpoint. While this may be a self-serving assertion by a named defendant in this litigation, other witnesses corroborated Lenzini's testimony. Lieutenant Lattan testified that, in his experience, he has "never seen or been aware of our police department or the City removing signs based on their content other than when they were in violation of the city ordinance." Sergeant Murray, for his part, suggested that the City may disagree with Hamman's anti-abortion message on "ideological[]" grounds, and that "they [the City] would be all for it" if his message were more "left" leaning. But he acknowledged that this was his "personal opinion," and that, as a matter of practice, City officials "take everything out of there that's on the City's right-of-way."

This testimony must be weighed against Hamman's submission of five photos purportedly showing three different signs (without anti-abortion messages) in the public right of way. Hamman acknowledges that he does not know how long these signs had been in the public right of way when he photographed them. This, then, leaves open the possibility that the City had not had time to remove them—something that, Lenzini explained, can happen from time to time. Surely, if these signs had been placed in the public right of way with the City's permission, or been left there after the City became aware of them, such evidence would support Hamman's claim of selective enforcement. But the record reveals no

such evidence. Hamman's photos are anecdotal evidence of signs in the public right of way, with no indication of how long they had been there. On the other hand, Lenzini and officers of the Carbondale Police Department are likely to be familiar with the City's enforcement practices. They testified consistently that signs are removed when they do not comply with the Ordinance, regardless of their content. The Court credits this testimony as evidence of the City's viewpoint neutral enforcement.

"[A] municipality is entitled to implement a nondiscriminatory ban on *all* private signs from the public roads and rights-of-way." *Id.* (emphasis in original). That is what Carbondale appears to have done here—in word and deed. The Seventh Circuit reached the same conclusion under similar circumstances in *Grand Chute*. There, a labor union was forced to remove a large inflatable rat from a protest site because it was in the public right of way in violation of a local sign ordinance. *Id.* at 1124. The union offered photographs of 90 claimed violations of the ordinance (which had not been addressed), arguing that they showed the town's selective enforcement against its pro-labor message. *Id.* at 1125. The town's code enforcement officer admitted that he may not have removed every non-compliant sign throughout the town but also explained that he had never seen a violation of the sign ordinance and failed to enforce it. *Id.* As a result, the code enforcement officer testified that he removed approximately 150 noncompliant signs per year. *Id.* The district court credited this testimony and found that it supported the town's "even-handed enforcement" of its sign ordinance. *Id.* at 1126. The Seventh Circuit agreed, finding that "no evidence indicated that [the code enforcement officer] was anything but systematic in his enforcement of the . . . [o]rdinance." *Id.*

*Grand Chute* extends comfortably to this case. Lenzini and his team remove hundreds

of signs per year to promote compliance with the Ordinance. Lenzini himself does so "pretty much daily." Sometimes, a sign may remain in the public right of way for up to "a couple of days"—for instance, if it is placed there over the weekend. The three signs Hamman personally observed that may have violated the Ordinance and gone unaddressed do not indicate a discriminatory enforcement practice because there is no evidence that they were placed in the public right of way with the City's permission. Rather, like in *Grand Chute*, the evidence shows "even-handed enforcement." And for that reason, the Court respectfully disagrees with Hamman's argument that Defendants engaged in viewpoint discrimination.

For these reasons, the Court finds that Hamman is not likely to succeed on the merits of his First Amendment claims. Although this is generally dispositive of the need for injunctive relief, *Barland*, 751 F.3d at 830, the Court will briefly address the remaining factors that bear on the preliminary injunction inquiry.

B.  Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Although the Court has determined that Hamman is unlikely to succeed on the merits of his First Amendment claims, it must consider the possibility of harm he may suffer from the City's continued enforcement of the Ordinance. The Seventh Circuit employs a "sliding scale" approach in this balancing inquiry: "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (citation modified). Thus, because Hamman is unlikely to succeed on the merits, he must make a strong showing of irreparable harm. The Court is not persuaded that he has done so.

As discussed, Hamman was and remains free to return to the area outside of CHOICES, carry his signs, and protest abortion. Nothing in this Order prevents him from conveying his message in this way. All he is prohibited from doing is placing his signs in the ground. So, while Hamman may experience *some* harm without injunctive relief, he has not shown the kind of irreparable harm that would justify such an extraordinary remedy. *See Weinberg*, 310 F.3d at 1041 (available alternative means of communication does not have to be speaker's "first choice.").

### C. Balance of Equities & Public Interest

When the government is the responding party, considerations of the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, because Hamman has not shown a likelihood of success on the merits, the balance of equities must tip decisively in his favor. *Cassel v. Snyders*, 458 F. Supp. 3d 981, 1003 (N.D. Ill. 2020). The Court is not convinced that it does. The Ordinance is the product of work done by representatives of the citizens of Carbondale. The City thus has an interest in enforcing it to achieve its stated goals of traffic safety and the avoidance of injuries to members of the public. And because the Ordinance is likely constitutional, its continued enforcement is in the public interest.

### CONCLUSION

For these reasons, Hamman's Motion for a Preliminary Injunction (Doc. 8) is **DENIED**.

**IT IS SO ORDERED.**

**DATED: January 21, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**

APPEAL,DKB,FILE_CREATED,NOCNST

# U.S. District Court
## Southern District of Illinois (East St. Louis)
## CIVIL DOCKET FOR CASE #: 3:25-cv-00736-NJR
## Internal Use Only

Hamman v. City of Carbondale, Illinois et al
Assigned to: Judge Nancy J. Rosenstengel
Cause: 42:1981 Civil Rights

Date Filed: 04/29/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Mark Brandon Hamman**

represented by **Christina A Compagnone**
American Center for Law & Justice
201 Maryland Ave NE
Washington, DC 20002
202-641-9168
Email: ccompagnone@aclj.org
*ATTORNEY TO BE NOTICED*

**Liam Ross Harrell**
American Center for Law & Justice
201 Maryland Ave NE
Washington, DC 20002
202-855-1778
Email: lharrell@aclj.org
*ATTORNEY TO BE NOTICED*

**Nathan Jeremiah Moelker**
American Center for Law & Justice
201 Maryland Ave NE
Washington, DC 20002
724-987-8477
Email: nmoelker@aclj.org
*ATTORNEY TO BE NOTICED*

**Kelsey E. McGee**
American Center for Law & Justice
201 Maryland Ave NE
Washington, DC 20002
202-641-9169
Email: kmcgee@aclj.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Carbondale, Illinois**
*an Illinois municipal corporation*

represented by **A. Courtney Cox**
Sandberg Phoenix
101 W. Vandalia
Third Floor
Edwardsville, IL 62025
217-493-9683
Email: ccox@sandbergphoenix.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John L. Gilbert**
Sandberg, Phoenix, et al - Edwardsville
101 West Vandalia Street
Suite 300
Edwardsville, IL 62025
618-659-9861
Fax: 618-659-9862
Email: jgilbert@sandbergphoenix.com
*ATTORNEY TO BE NOTICED*

**Philip J. Lading**
Sandberg, Phoenix, et al - Edwardsville
101 West Vandalia Street
Suite 300
Edwardsville, IL 62025
618-659-9526
Fax: 618-659-9862
Email: plading@sandbergphoenix.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Leonard J Snyder**
*in his individual and official capacities*

represented by **A. Courtney Cox**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John L. Gilbert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip J. Lading**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Lenzini**
*in his individual and official capacities*

represented by **A. Courtney Cox**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John L. Gilbert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip J. Lading**
(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 04/29/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AILSDC-5642427.), filed by All Plaintiffs. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Summons, # 4 Summons, # 5 Summons)(McGee, Kelsey) (Entered: 04/29/2025) |
| 04/30/2025 | 2 | Notice of Judge Assignment. Judge J. Phil Gilbert assigned. All future documents must bear case number 25-736-JPG. (aca) (Entered: 04/30/2025) |
| 04/30/2025 | 3 | Summons Issued as to City of Carbondale, Illinois, John Lenzini, Leonard J Snyder. Originals mailed to counsel for service. (aca) (Entered: 04/30/2025) |
| 04/30/2025 | 4 | NOTICE of Appearance by Nathan Jeremiah Moelker on behalf of All Plaintiffs (Moelker, Nathan) (Entered: 04/30/2025) |
| 04/30/2025 | 5 | ORDER OF RECUSAL. Judge J. Phil Gilbert recused. Case reassigned to Chief Judge Nancy J. Rosenstengel for all further proceedings. Signed by Judge J. Phil Gilbert on 4/30/2025. (jdh)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 04/30/2025) |
| 05/07/2025 | 6 | MOTION to Appear Pro Hac Vice by Attorney Liam Ross Harrell $200 fee paid,receipt number AILSDC-5649615 by on behalf of All Plaintiffs. (Harrell, Liam) (Entered: 05/07/2025) |
| 05/08/2025 | 7 | ORDER Granting 6 MOTION to Appear Pro Hac Vice by Attorney Liam Ross Harrell on behalf of plaintiff Mark Brandon Hamman.(aca)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 05/08/2025) |
| 05/08/2025 | 8 | MOTION for Preliminary Injunction by All Plaintiffs. (Attachments: # 1 Affidavit Declaration of Plaintiff, # 2 Exhibit Declaration Exhibits, # 3 Exhibit Notice of Manual Filing)(McGee, Kelsey) (Entered: 05/08/2025) |
| 05/23/2025 | 9 | NOTICE of Appearance by A. Courtney Cox on behalf of All Defendants (Cox, A.) (Entered: 05/23/2025) |
| 05/23/2025 | 10 | NOTICE of Appearance by Philip J. Lading on behalf of All Defendants (Lading, Philip) (Entered: 05/23/2025) |
| 05/23/2025 | 11 | NOTICE of Appearance by John L. Gilbert on behalf of All Defendants (Gilbert, John) (Entered: 05/23/2025) |
| 05/29/2025 | 12 | SUMMONS Returned Executed by All Plaintiffs. City of Carbondale, Illinois served on 5/20/2025, answer due 6/10/2025. (McGee, Kelsey) (Entered: 05/29/2025) |
| 05/29/2025 | 13 | SUMMONS Returned Executed by All Plaintiffs. John Lenzini served on 5/20/2025, answer due 6/10/2025. (McGee, Kelsey) (Entered: 05/29/2025) |
| 05/29/2025 | 14 | SUMMONS Returned Executed by All Plaintiffs. Leonard J Snyder served on 5/20/2025, answer due 6/10/2025. (McGee, Kelsey) (Entered: 05/29/2025) |

| 05/30/2025 | 15 | MOTION for Extension of Time to File Response/Reply as to 8 MOTION for Preliminary Injunction , 1 Complaint by All Defendants. (Attachments: # 1 Proposed Order)(Cox, A.) (Entered: 05/30/2025) |
| --- | --- | --- |
| 05/30/2025 | 16 | ORDER GRANTING 15 Consent Motion for Extension of Time. Defendant SHALL file a response to 8 Plaintiff's Motion for a Preliminary Injunction on or before June 10, 2025. Defendant's responsive pleading to 1 Plaintiff's complaint is due on or before July 10, 2025. Signed by Chief Judge Nancy J. Rosenstengel on 5/30/2025. (dkb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 05/30/2025) |
| 06/10/2025 | 17 | RESPONSE to Motion re 8 MOTION for Preliminary Injunction filed by All Defendants. (Attachments: # 1 Exhibit A, # 2 Affidavit Declaration of John Lenzini)(Cox, A.) (Entered: 06/10/2025) |
| 06/16/2025 | 18 | MOTION to Appear Pro Hac Vice by Attorney Christina A Compagnone $200 fee paid,receipt number AILSDC-5679533 by on behalf of Mark Brandon Hamman. (Attachments: # 1 Supplement)(Compagnone, Christina) (Entered: 06/16/2025) |
| 06/17/2025 | 19 | ORDER Granting 18 MOTION to Appear Pro Hac Vice by Attorney Christina A Compagnone on behalf of Plaintiff Mark Brandon Hamman.(aca)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 06/17/2025) |
| 06/17/2025 | 20 | REPLY to Response to Motion re 8 MOTION for Preliminary Injunction filed by Mark Brandon Hamman. (Moelker, Nathan) (Entered: 06/17/2025) |
| 07/02/2025 | 21 | MOTION for Hearing re 8 MOTION for Preliminary Injunction by All Plaintiffs. (McGee, Kelsey) (Entered: 07/02/2025) |
| 07/02/2025 | 22 | MOTION for Hearing by All Defendants. (Cox, A.) (Entered: 07/02/2025) |
| 07/03/2025 | 23 | RESPONSE to 22 Motion for Hearing filed by All Plaintiffs. (Attachments: # 1 Exhibit Proposed Order)(McGee, Kelsey) (Entered: 07/03/2025) |
| 07/07/2025 | 24 | ORDER GRANTING the parties' motions for a hearing (Docs. 21 and 22 ). The Court will hold an evidentiary hearing on 8 Plaintiff's Motion for a Preliminary Injunction on Monday **August 4, 2025** at **1:30 p.m.** The hearing will be held via video conference and a meeting link will be sent to all counsel of record in advance. Defendants have informed the Court that they "intend to introduce evidence" at the hearing. To ensure that each party has fair notice of the evidence being presented, the Court ORDERS Plaintiff and Defendants to exchange complete lists of testifying witnesses, a summary of each witness's expected testimony, and all exhibits to be introduced, no later than **noon** on Wednesday, **July 30, 2025**, and to provide a copy of their disclosures to the Court by email message to NJRpd@ilsd.uscourts.gov by the same deadline. Signed by Chief Judge Nancy J. Rosenstengel on 7/7/2025. (dkb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 07/07/2025) |
| 07/10/2025 | 25 | MOTION to Dismiss for Failure to State a Claim by John Lenzini, Leonard J Snyder. (Attachments: # 1 Exhibit A, # 2 Exhibit Declaration of John Lenzini, # 3 Exhibit Second Declaration of John Lenzini)(Cox, A.) (Entered: 07/10/2025) |
| 07/10/2025 | 26 | MOTION for Summary Judgment by City of Carbondale, Illinois. (Attachments: # 1 Exhibit A, # 2 Exhibit Declaration of John Lenzini, # 3 Exhibit Second Declaration of John Lenzini)(Cox, A.) (Entered: 07/10/2025) |

| 07/17/2025 | 27 | WITHDRAWN PER ORDER 37 - MOTION for Summary Judgment *Against the City of Carbondale* by Mark Brandon Hamman. (Moelker, Nathan) Modified on 8/4/2025 (tkm). (Entered: 07/17/2025) |
|---|---|---|
| 07/24/2025 | 28 | MOTION for Leave to File *Answer Instanter* by City of Carbondale, Illinois. (Attachments: # 1 Exhibit Answer and Affirmative Defenses to Complaint)(Cox, A.) (Entered: 07/24/2025) |
| 07/28/2025 | 29 | ORDER GRANTING 28 Defendant City of Carbondale's Motion for Leave to File an Answer Instanter. Defendant SHALL file its answer to Plaintiff's complaint on or before July 30, 2025. The Court also DIRECTS the parties to meet and confer regarding 27 Plaintiff's motion for summary judgment. Defendant's response to that motion is due on or before August 18, 2025. If, in light of this order, the motion still presents a disputed issue, Defendant SHALL file a response by this deadline. If it does not, Plaintiff SHALL inform the Court that the issue has been resolved. Signed by Chief Judge Nancy J. Rosenstengel on 7/28/2025. (dkb). THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 07/28/2025) |
| 07/28/2025 | 30 | MOTION to Continue *Hearing* by All Defendants. (Cox, A.) (Entered: 07/28/2025) |
| 07/28/2025 | 31 | RESPONSE in Opposition re 30 MOTION to Continue *Hearing* filed by All Plaintiffs. (McGee, Kelsey) (Entered: 07/28/2025) |
| 07/29/2025 | 32 | ORDER GRANTING 30 Defendants' Motion to Continue the Evidentiary Hearing. Defense counsel requests a "brief" continuance of the hearing due to a conflict with a pre-planned vacation. Plaintiff opposes Defendants' request for a continuance on the basis that this case has been pending for three months. Defendants' request, however, is the first of its kind, and does not appear to be for the purpose of delay. This is a simple matter of professional courtesy that did not need to result in contested motion practice. Nevertheless, the Court GRANTS Defendants' request for a continuance and will reschedule the evidentiary hearing in consultation with the parties. The August 4, 2025 evidentiary hearing is CANCELLED and will be reset by separate order. Signed by Chief Judge Nancy J. Rosenstengel on 7/29/2025. (dkb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 07/29/2025) |
| 07/29/2025 | 33 | ANSWER to 1 Complaint by City of Carbondale, Illinois.(Cox, A.) (Entered: 07/29/2025) |
| 07/29/2025 | 34 | DEMAND for Trial by Jury by All Defendants. (Cox, A.) (Entered: 07/29/2025) |
| 07/30/2025 | 35 | ORDER: After consultation with counsel, an evidentiary hearing re 8 Motion for Preliminary Injunction is **RESET for 8/11/2025 at 1:30 PM via video conference** before Chief Judge Nancy J. Rosenstengel. Connection information to this hearing will be sent by email to counsel. Signed by Chief Judge Nancy J. Rosenstengel on 7/30/2025. (drb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 07/30/2025) |
| 07/30/2025 | 36 | Consent MOTION to Withdraw 27 MOTION for Summary Judgment *Against the City of Carbondale* by All Plaintiffs. (McGee, Kelsey) (Entered: 07/30/2025) |

| 08/01/2025 | 37 | ORDER GRANTING 36 Plaintiff's consent motion to withdraw 27 his motion for summary judgment. The Court ACCEPTS the withdrawal of Plaintiff's summary judgment motion and will take no further action in connection with it. Signed by Chief Judge Nancy J. Rosenstengel on 8/1/2025. (dkb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 08/01/2025) |
|---|---|---|
| 08/06/2025 | 38 | STIPULATION *As to Facts for Preliminary Injunction Hearing By All Parties* Filed by Mark Brandon Hamman. (Moelker, Nathan) (Entered: 08/06/2025) |
| 08/11/2025 | 39 | NOTICE: An evidentiary hearing re 8 Motion for Preliminary Injunction is **SET for 8/11/2025 at 1:30 PM via video conference** before Chief Judge Nancy J. Rosenstengel. Connection information to this video conference was sent by email to counsel. In addition, access to non-testimonial portions of this hearing will be available to the public by calling toll free **571-353-2301**, when prompted enter Call ID: **459732554**. (drb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 08/11/2025) |
| 08/11/2025 | 40 | Minute Entry for proceedings held before Chief Judge Nancy J. Rosenstengel: Evidentiary hearing held via video conference on 8/11/2025 re 8 Motion for Preliminary Injunction. Evidentiary hearing shall resume on **8/13/2025 at 9:00 AM via video conference** before Chief Judge Nancy J. Rosenstengel. Video connection information will be emailed to counsel. Access to non-testimonial portions of this hearing will be available to the public by calling toll-free **571-353-2301**, when prompted enter Call ID: **459732554**. (Court Reporter Stephanie Rennegarbe.) (drb) (Entered: 08/11/2025) |
| 08/11/2025 | 41 | RESPONSE in Opposition re 25 MOTION to Dismiss for Failure to State a Claim filed by Mark Brandon Hamman. (Moelker, Nathan) (Entered: 08/11/2025) |
| 08/11/2025 | 42 | RESPONSE in Opposition re 26 MOTION for Summary Judgment filed by Mark Brandon Hamman. (Attachments: # 1 Exhibit Defendants' Text Messages, # 2 Exhibit Notice of Manual Filing)(Moelker, Nathan) (Entered: 08/11/2025) |
| 08/13/2025 | 43 | Minute Entry for proceedings held before Chief Judge Nancy J. Rosenstengel: Day 2 of Evidentiary Hearing held on 8/13/2025 via video conference re 8 Motion for Preliminary Injunction. Hearing completed and motion is taken under advisement. Order to issue. (Court Reporter Stephanie Rennegarbe.) (drb) (Entered: 08/13/2025) |
| 08/13/2025 | 44 | JOINT EXHIBIT LIST for evidentiary hearing as to 8 Motion for Preliminary Injunction.(drb) (Entered: 08/13/2025) |
| 08/21/2025 | 45 | REPLY to Response to Motion re 26 MOTION for Summary Judgment filed by City of Carbondale, Illinois. (Cox, A.) (Entered: 08/21/2025) |
| 08/22/2025 | 46 | REPLY to Response to Motion re 25 MOTION to Dismiss for Failure to State a Claim filed by John Lenzini, Leonard J Snyder. (Cox, A.) (Entered: 08/22/2025) |
| 10/20/2025 | 47 | Transcript of Evidentiary Hearing - Volume I, held on 8/11/2025, before Chief Judge Nancy J. Rosenstengel. Court Reporter Stephanie Rennegarbe, Telephone number 618-482-9226.<br><br>**NOTICE: Attorneys and unrepresented parties have 7 calendar days to file a Notice of Intent to Request Redaction of this transcript and 21 calendar days to file a Redaction Request. If redactions are not requested, the transcript will be made remotely available to the public without redaction after 90 calendar days. See the full Transcript Policy on the website at https://www.ilsd.uscourts.gov/sites/ilsd/files/Appendix-E.pdf** |

| | | |
|---|---|---|
| | | Transcript may be viewed at the public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/10/2025. Redacted Transcript Deadline set for 11/20/2025. Release of Transcript Restriction set for 1/20/2026. (skr) (Entered: 10/20/2025) |
| 10/20/2025 | 48 | Transcript of Evidentiary Hearing - Volume II, held on 08/13/2025, before Chief Judge Nancy J. Rosenstengel. Court Reporter Stephanie Rennegarbe, Telephone number 618-482-9226.<br><br>**NOTICE: Attorneys and unrepresented parties have 7 calendar days to file a Notice of Intent to Request Redaction of this transcript and 21 calendar days to file a Redaction Request. If redactions are not requested, the transcript will be made remotely available to the public without redaction after 90 calendar days. See the full Transcript Policy on the website at https://www.ilsd.uscourts.gov/sites/ilsd/files/Appendix-E.pdf**<br><br>Transcript may be viewed at the public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/10/2025. Redacted Transcript Deadline set for 11/20/2025. Release of Transcript Restriction set for 1/20/2026. (skr) (Entered: 10/20/2025) |
| 01/21/2026 | 49 | ORDER DENYING 8 Plaintiff's Motion for Preliminary Injunction. Signed by Judge Nancy J. Rosenstengel on 1/21/2026. (dkb) (Entered: 01/21/2026) |
| 01/22/2026 | 50 | ORDER: A Status Conference is **SET for 1/29/2026 at 10:30 AM via video conference** before Judge Nancy J. Rosenstengel. Connection information to the conference will be sent via email to counsel. Signed by Judge Nancy J. Rosenstengel on 1/22/2026. (drb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/22/2026) |
| 01/23/2026 | 51 | NOTICE OF APPEAL as to 49 Order on Motion for Preliminary Injunction by All Plaintiffs. Filing fee $ 605, receipt number AILSDC-5830675. (Moelker, Nathan) (Entered: 01/23/2026) |
| 01/23/2026 | 52 | DOCKETING STATEMENT by All Plaintiffs re 51 Notice of Appeal (Moelker, Nathan) (Entered: 01/23/2026) |